# Third District Court of Appeal

## State of Florida

Opinion filed July 09, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D13-1242 & 3D13-1246
Lower Tribunal Nos. 11-10900 & 11-10901

_____


**Dinuro Investments, LLC,**
Appellant,

vs.

**Felisberto Figueira Camacho, et al.,**
Appellees.


Appeals from the Circuit Court for Miami-Dade County, John W. Thornton, Judge.

Arnaldo Velez and Peter C. Bianchi, Jr., for appellant.

Avila Rodriguez Hernandez Mean & Ferri LLP, and Wilfredo A. Rodriguez and Eduardo F. Rodriguez, for appellee Ocean Bank; Shutts & Bowen LLP, and Steven M. Ebner and Stephen T. Maher, for all other appellees.


Before ROTHENBERG, LOGUE, and SCALES, JJ.

ROTHENBERG, J.

The plaintiff below, Dinuro Investments, LLC ("Dinuro"), appeals an order dismissing four counts of its complaint against the defendants. The trial court found that Dinuro lacks standing in its individual capacity and should have instead brought the suit derivatively on behalf of the limited liability company ("LLC"). This case presents us with an issue of law manifesting itself in increasing frequency—when does a member of an LLC have individual standing to bring suit against fellow members? We find, based on our comprehensive review of Florida case law, that in order to bring suit against other members of an LLC individually, a member must allege either (1) direct harm and special injury; or (2) a special contractual or statutory duty owed from the defendant member to the plaintiff member. Because Dinuro has satisfied neither of these tests, we affirm the trial court's dismissal.

## BACKGROUND

In 2005, Dinuro, Merici, LLC ("Merici"), and Starmac, LLC ("Starmac") established San Remo Homes, LLC ("San Remo"), a limited liability company, to develop real property in Florida. Merici is controlled by Felisberto Camacho ("Camacho"), and Starmac is controlled by Javier Macedo ("Macedo"). The three members of San Remo (Dinuro, Merici, and Starmac) created two branches of San Remo, one in Florida City ("San Remo FC") and one in Homestead ("San Remo HS") (collectively, "the San Remo Entities"). Each of the three members

2

contributed funds and received a one-third ownership and management interest in the San Remo Entities. After formation, the San Remo Entities obtained financing to purchase pieces of real estate in Florida City and Homestead through Ocean Bank. These loans were secured by promissory notes ("the Notes") in favor of Ocean Bank. Macedo, who controls Starmac, is also on the board of directors at Ocean Bank.

Due to the declining housing market, the San Remo Entities had difficulty meeting their loan obligations and were forced to negotiate loan modifications with Ocean Bank. After these modifications, the Notes were set to mature on March 29, 2010, and Ocean Bank also required that the members make additional contributions to the San Remo Entities. Although Merici and Starmac made these additional contributions, Dinuro did not. As the maturity date approached, Merici and Starmac refused to front Dinuro's portion of the contributions to satisfy their obligations to Ocean Bank, and thus, the Notes went into default.

Macedo and Camacho collaborated through other entities controlled by them, Romac, LLC and Felma, LLC, respectively, to form a new entity, SR Acquisitions, LLC, which itself has two sub-entities, SR Acquisitions-Florida City, LLC and SR Acquisitions-Homestead, LLC (collectively, "SR Acquisitions"). On August 9, 2011, Macedo and Camacho, through SR Acquisitions, purchased the Notes from Ocean Bank for the full outstanding Note amount. Dinuro was

3

approached to join in this new venture, but instead tried unsuccessfully to repurchase the Notes by itself. SR Acquisitions' purchase of the Notes essentially resulted in San Remo owing its entire outstanding debt to SR Acquisitions, which was comprised entirely of companies owned by Macedo and Camacho—who also owned two of the three companies with a membership interest in San Remo.

SR Acquisitions acquired the Notes, and it subsequently pursued two foreclosure actions against the San Remo Entities to regain the property secured by the Notes. The San Remo Entities, controlled by Macedo and Camacho, did not respond to the foreclosure action, and in March 2011, a default was entered against the San Remo Entities in both foreclosure actions. After substantial litigation, which included this Court ruling that Dinuro had no standing to intervene in one of the foreclosure actions, SR Acquisitions-Florida City, LLC v. San Remo Homes at Florida City, LLC, 78 So. 3d 636 (Fla. 3d DCA 2011) ("the Mandamus Action"), SR Acquisitions acquired the Homestead and Florida City properties, leaving Dinuro with no ownership interest in the properties and the San Remo Entities with no viable assets.

In April 2011, Dinuro initiated the underlying action against the appellees, which include Macedo, Camacho, and all of their related entities, as well as Ocean Bank, claiming in relevant part: the defendants breached the parties' contract, specifically the San Remo Entities' operating agreements[1] (Count I); Macedo and

4

Camacho tortiously interfered by causing their entities to breach the operating agreement (Count II); Ocean Bank tortiously interfered by inducing the other defendants to breach the operating agreement by offering to allow them to purchase the Notes at a discounted rate (Count III); and Merici, Starmac, Macedo, Camacho, and Ocean Bank conspired to cause the damage outlined in the previous counts (Count V).[2]  The defendants moved to dismiss the complaint on several grounds, including lack of individual standing.  The trial court ultimately granted the motion to dismiss on the basis that Dinuro's claims were derivative, not direct, and that it therefore lacked standing.  Dinuro appealed the dismissal of its claims against Ocean Bank and the defendants separately, and the appeals were consolidated for our review.

## DISCUSSION

We review a trial court's grant of a motion to dismiss de novo, and we assume for purpose of our analysis that all of the complaint's well-pleaded allegations are true.  Morin v. Fla. Power & Light Co., 963 So. 2d 258, 260 (Fla. 3d DCA 2007).  With this standard in mind, we address Dinuro's claims.

I.  **Dinuro's claims allege Dinuro was deprived of value when Merici and Starmac wrongfully devalued San Remo**

---

[1] San Remo FC and San Remo HS have separate, but nearly identical operating agreements.

[2] Dinuro has not appealed the dismissal of two additional counts for promissory estoppel (Count IV) and declaratory judgment (Count VI).

5

Dinuro has asserted a breach of contract claim against Macedo, Camacho, and their controlled entities (Starmac and Merici, respectively) for actions that allegedly violate various terms of the San Remo operating agreement. Dinuro has also asserted tortious interference claims against the member companies of SR Acquisitions and against Ocean Bank. The alleged result of these breaches is that San Remo was completely devalued based on the actions of two of the three members, Merici and Starmac, leaving the third member, Dinuro, with nothing to show for its investment. The trial court dismissed these claims, finding that Dinuro lacked individual standing to bring a direct claim against the other members for this type of harm, and that its claims should have been brought derivatively on behalf of San Remo. We agree, and write to provide clarity on a complicated point of law.

**A. When can an action alleging damages resulting from membership in an LLC be brought directly in an individual suit?**

Whether a particular action may be brought as a direct suit or must be maintained as a derivative suit can be a confusing inquiry. After all, a member or shareholder with a personal stake in a company or corporation necessarily sustains a loss when the company loses value, and determining which types of loss are directly compensable by direct suit requires fine lines to be drawn. These distinctions are even more difficult to draw for closely held corporations and LLCs, which typically have fewer individuals that possess an ownership interest,

6

because claims of mismanagement or self-dealing become a zero-sum game in which one party profits from the company's loss, while the other is harmed due to the company's reduced value.  See John W. Welch, <u>Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation</u>, 9 J. Corp. L. 147, 153-54 (1984) ("[A]s the community of interests between shareholders and their closely held corporation becomes more tightly interwoven, the basis upon which one differentiates derivative from individual actions becomes more critical and, as a consequence, the cases become less self-evident.").

Confounding this already complicated issue is the lack of clarity in Florida case law regarding what standard to apply when determining whether a suit for damage to a member or company can be brought directly.  Our review of the scholarly literature and case law from around the country evidences three specific approaches relied upon to determine whether an action may be brought directly or derivatively: (1) the "direct harm" test; (2) the "special injury" test; and (3) the "duty owed" test.  <u>See, e.g.</u>, Daniel S. Kleinberger, <u>Direct Versus Derivative and the Law of Limited Liability Companies</u>, 58 Baylor L. Rev. 63, 87-110 (2006); Elizabeth J. Thompson, <u>Direct Harm, Special Injury, or Duty Owed: Which Test Allows for the Most Shareholder Success in Direct Shareholder Litigation?</u>, 35 J. Corp. L. 215, 220-22 (2009).  We briefly explain each of these approaches, along

with their respective merits and difficulties, before explaining Florida's current stance on this issue based on existing case law.

## 1. The Direct Harm Test

A majority of courts across the country appear to apply the "direct harm" test, which distinguishes direct from derivative actions by examining whether the harm from the alleged wrongdoing flows first to the company and only damages the shareholders or members due to the loss in value of their respective ownership interest in the company, or whether the harm flows "directly" to the shareholder or member in a way that is not secondary to the company's loss. See, e.g., Schuster v. Gardner, 25 Cal. Rptr. 3d 468, 473 (Cal. Ct. App. 2005) ("[A] shareholder *cannot* bring a direct action for damages against management on the theory their alleged wrongdoing decreased the value of his or her stock (e.g., by reducing corporate assets and net worth)." (emphasis in original)); Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1035-36 (Del. 2004) ("The analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?"); Lightner v. Lightner, 266 P.3d 539, 545 (Kan. Ct. App. 2011) ("Shareholders do not have standing to sue for harms to the corporation or even for the derivative harm to themselves that might arise from a tort or other wrong to the corporation."); Shenker v. Laureate Educ., Inc., 983

A.2d 408, 424 (Md. 2009) ("In contrast to a derivative action, a shareholder may bring a direct action, either individually or as a representative of a class, against alleged corporate wrongdoers when the shareholder suffers the harm directly or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation.").

The direct harm approach, then, looks at the injury alleged by the individual shareholder and determines whether that injury flows from some damage to the company itself. Thus, the examining court must compare the individual's harm to the company's harm. Under this test, a shareholder can only bring a direct suit if the damages are unrelated to the damages sustained by the company and if the company would have no right to recover in its own action. See Tooley, 845 A.2d at 1036. This approach likely provides the greatest simplicity in application, as the courts need only look to whether the alleged wrongful conduct devalued the company as a whole or was directed specifically towards the individual plaintiff.

One downside to this approach, however, is that it potentially allows a wrongdoer to devalue the company for personal gain without fear of personal repercussions. Claims alleging that a majority member has embezzled assets from the company to the detriment of minority members, for example, would only be cognizable as derivative actions, and any recovery for such an action would go to the company. The wrongdoer would then receive a proportionate share of the

return of the embezzled funds so that he is made whole despite being the very party causing the harm. In other words, a strict "direct harm" approach may be especially harsh in small company settings because minority members will not be able to recover personal money that is taken by an oppressive majority.

## 2. The Special Injury Test

Another test utilized in many jurisdictions is the so-called "special injury" test. This test requires the court to compare the individual plaintiff's alleged injury to those injuries suffered by the other members or shareholders of the company and then determine whether the plaintiff's injury is separate and distinct from other members or shareholders.[3] See, e.g., Hanson v. Kake Tribal Corp., 939 P.2d 1320, 1327 (Alaska 1997) ("A plaintiff alleges a special injury and may maintain an individual action if the shareholder complains of an injury distinct from that suffered by other shareholders, or a wrong involving one of the shareholder's contractual rights as a shareholder." (quoting 13 Fletcher Cyclopedia of the Law of Private Corporations § 5908)); Tooley, 845 A.2d at 1035 ("A special injury is a wrong that is separate and distinct from that suffered by other shareholders, . . . or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." (alteration in original) (internal quotations omitted)); Sw. Health &

---

[3] Some cases treat violations of contractual duties as "special injuries," but we believe these to be separate inquiries for analytical purposes.

Wellness, L.L.C. v. Work, 639 S.E.2d 570, 575-76 (Ga. Ct. App. 2006) ("While shareholders may also bring direct actions for injuries done to them in their individual capacities by corporate fiduciaries, in order to pursue such a direct claim the shareholder must allege more than a wrong done to the corporation, either a separate and distinct injury from that suffered by other shareholders or a wrong involving a contract right existing independently of any right of the corporation."); Loewen v. Galligan, 882 P.2d 104, 119 (Or. Ct. App. 1994) ("A special injury is established where there is a wrong suffered by the shareholder not suffered by all shareholders generally or where the wrong involves a contractual right of the shareholders, such as the right to vote.").

Jurisdictions applying the "special injury" test require a plaintiff to demonstrate that he has sustained a loss that is substantially different from those losses sustained by other shareholders or members before he can maintain an individual or direct suit. Such a test allows greater flexibility for plaintiff–members to bring a direct suit in small closely held corporations or limited liability companies. See Kleinberger, supra, at 120 (explaining how the court in Ayres v. AG Processing Inc., 345 F. Supp. 2d 1200, 1208-09 (D. Kan. 2004), allowed a direct individual suit against other members of an LLC who conspired to deprive the plaintiff–member of profits because the plaintiff's injuries were "separate and

distinct"). However, this test can be much more difficult to apply, as the "special" nature of the injury can be a nebulous inquiry that is often not readily apparent.

**3. The Duty Owed Test**

A final iteration of the standard for determining when an action should be direct or derivative is the "duty owed" test. This test simply examines the statutory and contractual terms to determine whether the duty at issue was owed to the individual member or shareholder by a particular manager or member, or whether those duties were owed to the company generally. See, e.g., G & N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 235 (Ind. 2001) ("We believe that the correct approach draws the distinction based on the rights the shareholder asserts. Under this view, a direct action may be brought when: 'it is based upon a primary or personal right belonging to the plaintiff–stockholder. . . . It is derivative when the action is based upon a primary right of the corporation but which is asserted on its behalf by the stockholder because of the corporation's failure, deliberate or otherwise, to act upon the primary right.'" (alteration in original) (quoting Schreiber v. Butte Copper & Zinc Co., 98 F. Supp. 106, 112 (S.D.N.Y. 1951))). Many courts have also applied this test as an exception to the general rule requiring either direct harm or special injury. See, e.g., Harrington v. Batchelor, 781 So. 2d 1133, 1135 (Fla. 3d DCA 2001) (holding that a plaintiff may assert a direct action when there is a special duty owed even if the harm otherwise flows to the company); Shenker, 983

A.2d at 424 ("[A] shareholder may bring a direct action . . . against alleged corporate wrongdoers when the shareholder suffers the harm directly **or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation**." (emphasis added)).

The "duty owed" approach allows for the greatest freedom of contract, as parties can actively decide whether and when to allow direct suit between members for various categories of conduct. Unfortunately, many operating agreements and statutes do not specify who owes a particular duty, and to whom that duty is owed. Indeed, section 608.4225(1), Florida Statutes (2008), subjects all managing members to a duty of loyalty and care that is owed "to the limited liability company **and** all of the members of the limited liability company." (emphasis added). In such cases, the "duty owed" test may provide little guidance or can be interpreted to allow either a direct or derivative suit.

#### 4. Florida's Test

Florida law, as it currently stands, embraces none of these tests individually, but utilizes all three to determine whether an action can be brought directly. As the Florida Supreme Court has not established a rule on this issue, a determination of the current standard requires the synthesis of nearly fifty years of case law developed in the Florida Courts of Appeal.

The first Florida case to enunciate a rule governing the direct versus derivative action distinction was <u>Citizens National Bank of St. Petersburg v. Peters</u>, in which the Second District Court of Appeal held that:

> A Florida court has defined a derivative suit as an action in which a stockholder seeks to enforce a right of action **existing in the corporation**. Conversely, a direct action, or as some prefer, an individual action, is a suit by a stockholder to enforce a right of action **existing in him**.
>
> What these definitions attempt to convey is that a stockholder may bring a suit in his own right to redress **an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders.** If, however, the injury is primarily against the corporation, or the stockholders generally, then the cause of action is in the corporation and the individual's right to bring it is derived from the corporation.

175 So. 2d 54, 56 (Fla. 2d DCA 1965) (third emphasis added) (internal citations omitted).

<u>Peters</u> seems to require both direct harm **and** special injury before a member or shareholder can maintain a direct action, and that language has essentially become canon in Florida corporate law, as nearly all subsequent cases deciding whether an action is direct or derivative have quoted <u>Peters</u> or one of its progeny. <u>See, e.g.</u>, <u>Karten v. Woltin</u>, 23 So. 3d 839, 840-41 (Fla. 4th DCA 2009) (quoting <u>Fort Pierce Corp. v. Ivey</u>, 671 So. 2d 206, 207 (Fla. 4th DCA 1996)); <u>Ivey</u>, 671 So. 2d at 207 (quoting <u>Peters</u>, 175 So. 2d at 56); <u>Alario v. Miller</u>, 354 So. 2d 925, 926 (Fla. 2d DCA 1978) (quoting <u>Peters</u>, 175 So. 2d at 56); <u>Fried v. Easton</u>, 293 So. 2d 87, 88 (Fla 3d DCA 1974) (quoting <u>Peters</u>, 175 So. 2d at 56).

This two-prong approach can be relatively simple, and Florida is certainly not unique in requiring multiple tests to be satisfied prior to the initiation of a direct action. See, e.g., Altrust Fin. Servs., Inc. v. Adams, 76 So. 3d 228, 241 (Ala. 2011) ("It is only when a stockholder alleges that certain wrongs have been committed by the corporation as a direct fraud upon him, **and** such wrongs do not affect other stockholders, that one can maintain a direct action in his individual name." (emphasis added) (quoting Green v. Bradley Constr., Inc., 431 So. 2d 1226, 1229 (Ala.1983))). However, Florida cases applying the Peters standard have not analyzed the issue uniformly or even explicitly acknowledged a two-prong standard.

For example, many cases have quoted the Peters test and then analyzed only whether a direct harm was inflicted. See, e.g., AmSouth Bank v. Wynne, 772 So. 2d 574, 575 (Fla. 1st DCA 2000) ("In the instant case, the damages claimed by appellees flowed primarily from injuries to [the companies], respectively. The injuries to appellees were indirect, indistinct from injuries to other shareholders, and did not provide a basis for their individual suits."); Alario, 354 So. 2d at 926 ("If the damages are only indirectly sustained by the stockholder as a result of injury to the corporation, the stockholder does not have a cause of action as an individual."); Fried, 293 So. 2d at 88 ("After a careful reading of the counterclaim, we find that the counterclaimant alleges therein no injury directly sustained by

15

him, but rather only injuries inflicted upon the corporation.").  Conversely, other Florida cases ruling on this issue have ostensibly stated the two-prong standard and then based their holding solely on the "special injury" test.  See, e.g., Chemplex Fla. v. Norelli, 790 So. 2d 547, 549 (Fla. 4th DCA 2001) ("The [plaintiffs'] allegation that they were harmed individually is not itself conclusive without additional factual allegations showing their injuries were separate and apart from those of other shareholders."); Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 742 So. 2d 381, 389 (Fla. 4th DCA 1999) ("To state a claim, appellants must show special damages, a loss actually sustained by them which might not be common to other shareholders.").

To further complicate the issue, Florida courts also recognize an exception to the Peters test when an individual member or manager owes a specific duty to another member or manager apart from the duty owed to the company.  See, e.g., Braun v. Buyers Choice Mortg. Corp. ex rel. McAloon, 851 So. 2d 199, 203 (Fla. 4th DCA 2003) ("Generally, a shareholder cannot sue in the shareholder's name for injuries to a corporation unless there is a special duty between the wrongdoer and the shareholder, and the shareholder has suffered an injury separate and distinct from that suffered by other shareholders."); Harrington, 781 So. 2d at 1135-36 ("[A] shareholder can sue for breach of [a] contract to which he is a party, even if he has not suffered an injury separate and distinct from that suffered by

16

other shareholders." (alterations in original) (quoting <u>Hikita v. Nichiro Gyogyo Kaisha, Ltd.</u>, 713 P.2d 1197, 1200 (Alaska 1986))).  Indeed, in <u>Harrington</u>, this Court found that there were two exceptions to the direct harm test: when the shareholder has sustained special injury, and when there is a separate duty owed to the shareholder.  781 So. 2d at 1135 (quoting 12B William Meade Fletcher, <u>Fletcher Cyclopedia of the Law of Private Corporations</u> § 5911, at 458 (perm. ed., rev. vol. 2000)).  <u>Harrington</u>, however, based its holding entirely on whether there was a special duty owed.  <u>Id.</u> at 1136.

In short, the current Florida doctrine explaining which actions should be maintained directly and which must be brought derivatively is incredibly opaque, the application often varying from case to case depending on the facts.  In our view, the only way to reconcile nearly fifty years of apparently divergent case law on this point is by holding that an action may be brought directly only if (1) there is a direct harm to the shareholder or member such that the alleged injury does not flow subsequently from an initial harm to the company **and** (2) there is a special injury to the shareholder or member that is separate and distinct from those sustained by the other shareholders or members.  <u>Peters</u>, 175 So. 2d at 56 ("[A] stockholder may bring a suit in his own right to redress an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders."); <u>but see</u> <u>Harrington</u>, 781 So. 2d at 1135 (applying only the direct

17

harm test and stating that a shareholder can still maintain a direct action if there is a special injury or specific and separate duty owed).

We also find that there is an exception to this rule under Florida law.  A shareholder or member need not satisfy this two-prong test when there is a separate duty owed by the defendant(s) to the individual plaintiff under contractual or statutory mandates.  Braun, 851 So. 2d at 203.  Thus, if the plaintiff has not satisfied the two-prong test (direct harm and special injury) or demonstrated a contractual or statutory exception, the action must be maintained derivatively on behalf of the corporation or company.  Such a rule comports with general standards of corporate and LLC law by protecting individuals from the obligations arising out of their relationship to the company, while also allowing the parties greater freedom to contractually set their respective obligations.

**B.  Application of the Florida Test to the facts of this case**

Turning now to the facts of the case before us, we must determine whether Dinuro's claims allege both direct harm and special injury, and if not, whether the other members owe Dinuro a separate duty based on the operating agreement or Florida statutes.  "We look to the body of the complaint to determine whether the injury is direct to the shareholder or to the corporation." Karten, 23 So. 3d at 841.

*1.  Direct Harm and Special Injury*

18

Dinuro's claims essentially allege that the other two members, Merici and Starmac (along with their individual owners), intentionally allowed the San Remo Entities to default on the Notes so that Merici and Starmac could purchase the loans at a discount and foreclose on the mortgaged properties, thereby depriving the San Remo Entities of their sole assets. The tortious interference claims and civil conspiracy claim largely arise out of these same allegations.

The fatal flaw with Dinuro's claims is that, even assuming all allegations to be true, Dinuro's injuries are merely as a result of the total devaluation of the San Remo Entities and are therefore an indirect harm. While it may arguably be true that Merici and Starmac have profited from their alleged misconduct or at least have suffered an injury less substantial than Dinuro because they have regained the properties as members of the SR Acquisitions entities while Dinuro has retained nothing, this analysis is germane only to the **special injury** inquiry, and cannot cure the failure to allege a **direct harm**, which is required to maintain a direct action under Florida jurisprudence. Therefore, Dinuro has suffered no direct harm, and cannot maintain a direct action on that basis.

### 2. *Separate Duty Owed Under the Operating Agreement*

As previously discussed, there is an exception to the general two-prong Peters test if some separate duty is owed from a defendant to the plaintiff shareholder or member, usually granted by contract or statute. Dinuro claims the

defendants owe Dinuro a separate duty under the terms of the San Remo Entities'

operating agreements, and that a breach of the operating agreements is cognizable

as a direct individual action.[4]  The terms of the operating agreements and the well-

pleaded causes of action in the complaint, however, belie that contention.

An operating agreement is a contract.  See Razin v. A Milestone, LLC, 67

So. 3d 391, 396 (Fla. 2d DCA 2011).  Thus, if the members owed a duty directly to

Dinuro under the terms of the San Remo operating agreement, Dinuro could

maintain a direct action under this exception.  However, unlike a typical bilateral

contract, where both signing parties owe duties to one another, operating

agreements establish a more complicated and nuanced set of contractual rights and

duties.  Indeed, the effect of an operating agreement on members of the limited

liability company and third parties is largely established by Chapter 608 of the

Florida Statutes.

Section 608.423(1) of the Florida Statutes provides:

> Except as otherwise provided in subsection (2), all members of a
> limited liability company may enter into an operating agreement,
> which need not be in writing, to regulate the affairs of the limited

---

[4] A separate duty is typically created by contract or by statute.  Dinuro potentially may have been able to maintain a direct action for breach of a statutory fiduciary duty under section 608.4225, Fla. Stat. (2011), see 608.4225(1) ("[E]ach manager and managing member shall owe a duty of loyalty and a duty of care to the limited liability company and all of the members of the limited liability company."), however, Dinuro abandoned its breach of fiduciary duty claim early in the litigation.  We therefore do not reach the issue of whether a direct claim may be brought for breach of fiduciary duty under section 608.4225 in this opinion.

20

liability company and the conduct of its business, establish duties in addition to those set forth in this chapter, **and to govern relations among the members, managers, and company.** Any inconsistency between written and oral operating agreements shall be resolved in favor of the written agreement. The members of a limited liability company may enter into an operating agreement before, after, or at the time the articles of organization are filed, and the operating agreement takes effect on the date of the formation of the limited liability company or on any other date provided in the operating agreement. To the extent the operating agreement does not otherwise provide, this chapter governs relations among the members, managers, and limited liability company.

(emphasis added). This distinction is important because the signing parties to an operating agreement may very well decide that no individual member owes the other members any duties whatsoever, and that those duties are owed only to the company. When analyzing a claim for breach of an operating agreement, the precise terms of the agreement are critical.

Here, in support of its claim for breach of contract, Dinuro cites section 12 of the San Remo HS operating agreement,[5] which outlines certain conduct that will constitute a default under the operating agreements and then explains the effects of a member's default. Section 12.1 of the agreement explains what conduct will constitute a default; section 12.2 states that in the event of an uncured default the non-defaulting members may terminate the rights of the defaulting member and continue conducting business on behalf of the company; section 12.3 allows the

[5] There is a separate operating agreement for San Remo FC, which is numbered differently, but the language in the two operating agreements is identical regarding the terms and remedies for default.

non-defaulting members to purchase the membership shares of the defaulting member; and section 12.4 provides a catch-all provision providing additional remedies for non-defaulting members. Dinuro focuses specifically on sections 12.1 and 12.4 of the operating agreement, which state, in relevant part:

12.1 **Event of Default.** The following events shall constitute a default by a Member:

12.1.1 Violation of the provisions of this Agreement and failure to remedy the violation within sixty (60) days after written notice of the violation to the alleged defaulting Member from a non-defaulting Member and a reasonable opportunity to cure.

. . . .

12.4 **Additional Effects of Default.** In the event of a Member's default under this Agreement, **the LLC and the Members may, at their election, pursue any and all remedies provided under this Agreement or any other remedies available at law or equity.** The LLC and the Members shall not be deemed to waive or forfeit, by pursuit of remedies provided under this Agreement not considered liquidated damages, any amounts due to them as a result of another Member's default under this Agreement. If non-defaulting Members of the LLC waive another Member's specific default, the waiver shall not be deemed to extend to any other default of this Agreement. **If the non-defaulting Members of the LLC refrain from enforcing any remedy available under this Agreement against a defaulting Member, they shall not be deemed to have waived the default.**

(emphasis added). Dinuro believes the emphasized language in section 12.4 provides it a direct action against the other members for a breach of the terms of the operating agreement. We disagree.

The language in section 12.4 allows the company and the members to "pursue any and all remedies provided under this Agreement or any other remedies available at law or equity." The specific remedies provided in sections 12.2 and

22

12.3 of the operating agreement are the ability to terminate the defaulting member's interest in the company and the preemptive right to buy out the defaulting member's shares. Allowing non-defaulting members to pursue "any other remedies available at law or equity" simply provides that the remedies articulated in the agreement are not exclusive, and that a non-defaulting member may pursue additional remedies consistent with Florida statutory and common law—it does *not* expand a member's rights beyond those currently available in Florida law. Indeed, the remedies provided in section 12 track almost identically the remedies provided in section 608.4211(5), Florida Statutes (2011), which establishes the default effect of a member's failure to contribute required funds.

Conspicuously missing from the operating agreement is any provision stating that the members shall be directly liable to each other for breaches of the terms of the operating agreement. Absent such a stipulation, we presume individual members are **not** liable for obligations or decisions of the company, as limited liability is one of the paramount reasons for forming an LLC. Section 608.4227 of the Florida Statutes specifically provides that members are typically shielded from individual liability for their involvement with an LLC unless the terms of the articles of organization or the operating agreement provide otherwise. See § 608.4227(1), Fla. Stat. (2011) ("Except as provided in this chapter, the members, managers, and managing members of a limited liability company are not

23

liable, solely by reason of being a member or serving as a manager or managing member, under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the limited liability company."); § 608.4227(3) ("The member's, managing member's, manager's, or other person's duties and liabilities may be expanded or restricted by provisions in a limited liability company's articles of organization or operating agreement."). Dinuro has not and cannot show such an exception in the San Remo operating agreements, so it has not pled an individual cause of action against the other members of the company.

Because the operating agreements do not authorize suit against the members directly for a breach of their terms, and because Dinuro has not alleged a breach of the statutory duty of loyalty or care, no separate duty was owed specifically to Dinuro, and the trial court properly dismissed Dinuro's causes of action for lack of standing in Dinuro's individual capacity. These claims should have been brought as a derivative action.

## CONCLUSION

As analyzed above, Florida law does not permit a member of an LLC to sue individually for damages arising out of its status as a member of a company unless the damages arise from a direct harm and special injury, or if there is a separate duty owed from the defendant to the plaintiff member. Dinuro has not satisfied either of these tests. Therefore, the remedy available at common law or in equity

24

was for Dinuro to bring a derivative action on behalf of the company, which it has failed to do.  Thus, the trial court was correct in dismissing Dinuro's complaint.

Affirmed.[6]

---

[6] We find Dinuro's remaining arguments on appeal without merit.