# Third District Court of Appeal

**State of Florida**


Opinion filed February 28, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-448
Lower Tribunal No. 13-24371
_____


**Ferk Family, LP,**
Appellant,

vs.

**Gail Frank, etc., et al.,**
Appellees.



An Appeal from the Circuit Court for Miami-Dade County, John W. Thornton, Jr., Judge.

Robin Bresky and Jonathan Mann (Boca Raton), for appellant.

Mark, Migdal & Hayden, LLC, and Donald J. Hayden and Lara O'Donnell Grillo, for appellees.


Before SALTER, EMAS and LOGUE, JJ.

EMAS, J.

## I. INTRODUCTION

Ferk Family, LP (defendant and counter/third-party plaintiff below) appeals two final summary judgment orders entered in favor of Gail Frank, COJO Holdings, Swastic Srihari Kaveeshwar, Joe Mitchell and the Estate of Walter Frank (plaintiffs and counter/third-party defendants below).  For the reasons that follow, we affirm in part and reverse in part.

## II. FACTS AND PROCEDURAL HISTORY

### a. The Creation and Operation of Med-Rite

Med-Rite Laboratories, LLC ("Med-Rite" or "the Company") was formed in April 2010 for the purpose of manufacturing, marketing and selling a medical device to treat hemorrhoids, which was developed by Frank Melendez.  Melendez partnered with Larry Ferk and Ted Morgan to find investors for the startup, and successfully obtained investments from, *inter alia*, Gail and Walter Frank, a married couple.   The original Members of the Company were Alex Melendez,[1] Gail Frank, Larry Ferk, Swastic Srihari Kaveeshwar ("Swastic Srihari") and Ted Morgan.

Early on, there were serious disagreements between the Members over issues related to financing, the location of the device's manufacturing plant,[2] and

---

[1] Alex Melendez is Frank Melendez's son, and obtained his shares in exchange for Frank's contribution of the patent, existing inventory and equipment.

[2] At the time, the manufacturing plant was in Medellin, Colombia, but the Franks

2

termination of key personnel.  In July 2011, the members agreed to raise at least $1 million in capital, which they were able to secure with a capital investment of $1 million from Joe Mitchell at the end of 2011.[3]

### b. The Relevant Provisions of the Operating Agreement

On January 16, 2012, an Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement") was executed.  At the time of this Operating Agreement, the Members were:  Larry Ferk, Gail Frank, Mas-Rite, LLC, Alternative Technologies International, Inc., Swastic Srihari, and Joe and Connie Mitchell.  The Operating Agreement identified the managers in section 5.1 as:  Larry Ferk, Gail Frank, Walter Frank, Joe Mitchell and Ted Morgan.

Under the terms of the Operating Agreement:

-   A Manager may be removed at any time from the Board of Management, including for "Cause" (as defined below) as determined by the Members holding a Majority in Interest. . . . In the event of the death, incapacity, removal or resignation of any of the Managers, a successor Manager shall be selected by the Members holding a Majority of the Interests.  For purposes of Article V, "Cause" shall mean fraud, willful misconduct, gross negligence, breach of fiduciary duty or other gross misconduct by a Manager with respect to a material matter relating to the affairs of the Company.  § 5.1(e), Operating Agreement.

-   A "Majority in Interest" is defined as "the affirmative vote of the Members holding greater than 60% of the Percentage Interests or the affirmative vote

_____

sought to move the plant to Texas.

[3] There were also negotiations with another potential investor, GreenHill Ventures, but the Franks and Joe Mitchell were concerned that the GreenHill Ventures deal would dilute their shares, and therefore, the negotiations never came to fruition.

or presence of greater than 60% of the Managers." § 1.1, Operating Agreement.

- Any Member may loan Med-Rite an aggregate of $500,000 with approval of a Majority of the Board of Management. § 3.1(c), Operating Agreement.

- A Member may not transfer his interest in the company, with certain exceptions, without the prior written consent of the Members holding a majority-in-interest. Any such transfer is void and shall not bind the company. § 9.1, Operating Agreement.

- In the event any Member wants to transfer his interest, the Member shall notify the company and the other Members in writing, offering to sell the interest to the company or the other Members pro-rata. § 9.3(a), Operating Agreement.

Shortly after the Operating Agreement was executed, Ted Morgan resigned from the management board and the other Members bought him out.

## c. The Member Interests in Med-Rite

Following Ted Morgan's resignation and the buyout of his interest in the Company, and during the relevant time periods thereafter, the Member interests in Med-Rite were as follows:

| | MEMBER | MANAGER | % INTEREST |
|---|---|---|---|
| Ferk Family, LP (Larry Ferk) | √ | √ | 26.49% |
| Gail Frank | √ | √ | 28.99% |
| COJO Holdings (Joe Mitchell) | √ | √ | 24.90% |
| Mas-Rite, LLC (Alex/Frank Melendez) | √ | | 16.21% |
| Swastic Srihari | √ | | 3.41% |
| Walter Frank | | √ | 0% |

4

The remaining members continued to have problems. On June 26, 2012, Ferk sent an email to Gail Frank, stating that he refused to continue working with Swastic Srihari. On June 28, 2012, Walter Frank wrote to Larry Ferk to inform him that he was being terminated for cause from the board of management, pursuant to section 5.1(e) of the Operating Agreement.

### d. The Transfer of Interest in *Mas-Rite* to Ferk Family

Shortly thereafter, on July 17, 2012, Mas-Rite, LLC ("Mas-Rite") transferred Alex Melendez's majority interest in Mas-Rite to Ferk Family, which, as a practical matter, resulted in a transfer of Mas-Rite's voting interest in Med-Rite to Ferk Family.

### e. The Litigation

On August 1, 2012, Ferk Family filed a member derivative action on behalf of Med-Rite against Gail and Walter Frank and Joe Mitchell, alleging a breach of fiduciary duty, and seeking to inspect records. The trial court appointed Herbert Stettin to conduct an independent investigation, and Mr. Stettin issued a report, finding it was not in the best interest of the company for the derivative action to proceed. Thereafter, the trial court dismissed the derivative action.

During the discovery process it came to light that Ferk Family had purchased a majority interest in Mas-Rite, giving it voting rights in Med-Rite. However, because the Operating Agreement prohibits the transfer of interest in

5

Med-Rite without the consent of the other members, and also requires compliance with a right-of-first-offer clause, Gail Frank, along with COJO Holdings (Joe Mitchell) and Swastic Srihari filed suit against Ferk Family, Mas-Rite and Alex Melendez, seeking declaratory relief and damages for breach of contract and specific performance. The complaint was later amended, and the operative Second Amended Complaint added claims for breach of implied covenant of good faith and fair dealing.

Ferk Family answered, asserted affirmative defenses, counterclaimed, and asserted third-party claims against Joe Mitchell and Walter Frank, claiming Larry Ferk was wrongfully removed as a manager in violation of the Operating Agreement, depriving Ferk Family and other minority members of their voice in the operation and management of Med-Rite, as well as virtually destroying their investment and equity interest in the company. In addition, it was alleged that Gail and Walter Frank had loaned more than the permissible amount for loans by members, in violation of the Operating Agreement. Counts were alleged against the counter-defendants and the third-party defendants, collectively, for breach of fiduciary duty, two counts of breach of contract, and two counts of breach of implied covenant of good faith and fair dealing.

Gail Frank, COJO Holdings, Joe Mitchell, Swastic Srihari and the Estate of Walter Frank[4] moved for summary judgment on their Second Amended Complaint,

6

and on Ferk Family's counterclaim and third-party claims. Ferk Family also moved for summary judgment on the Second Amended Complaint. The court denied the motions for summary judgment.

Thereafter, Counts One and Two of the Second Amended Complaint for declaratory judgment were withdrawn, and all parties later agreed to submit the summary judgment papers and existing record for the trial court's final determination in lieu of a trial on the remaining claims of the Second Amended Complaint.

The court conducted a bench trial on the counterclaims and third party claims, following which it entered an order in favor of counter/third-party defendants Gail Frank, COJO Holdings, Joe Mitchell, Swastic Srihari and the Estate of Walter Frank.

### f. The Orders on Appeal

On January 28, 2016, the trial court entered two orders: (1) granting final summary judgment in favor of Gail Frank, COJO Holdings and Swastic Srihari on the remaining claims in their Second Amended Complaint; and (2) entering judgment in favor of counter/third-party defendants Gail Frank, COJO Holdings, Joe Mitchell, Swastic Srihari and the Estate of Walter Frank on Ferk Family's counterclaims/third-party claims.

---

[4] Walter Frank passed away during the pendency of the proceedings.

**g. The Issues on Appeal**

On appeal, Ferk Family asserts, *inter alia*, the trial court:

1. Erred in granting summary judgment on the Second Amended Complaint upon a determination that Melendez's transfer of his interest in Mas-Rite was void because it violated the Right of First Offer Provision of the Operating Agreement;

2. Incorrectly construed the Operating Agreement, resulting in an erroneous finding for counter/third-party defendants on Ferk Family's claim for improper removal of Larry Ferk as manager;

3. Incorrectly found Ferk Family's claims were derivative, where the claims fell within the exception for claims based on a special contractual or statutory duty.

4. Improperly concluded that the business judgment rule applied and protected Med-Rite's officers and managers, because the Operating Agreement excluded application of the business judgment rule and because, as a matter of law, the business judgment rule did not apply to Gail Frank or Joe Mitchell.

5. Erred in finding Ferk Family failed to establish a viable damage model.

## III. ANALYSIS

### a. Did the trial court err in granting summary judgment in favor of plaintiffs on their Second Amended Complaint?

At the time summary judgment was granted by the court, the only counts which remained in the operative Second Amended Complaint were Count III (breach of contract); Count IV (breach of implied covenant of good faith and fair

8

dealing); and Count V (specific performance). All three of these claims related to Melendez's transfer of his majority interest in Mas-Rite to Ferk Family, which resulted in giving Ferk Family Mas-Rite's 16.21% interest in Med-Rite (in addition to the 26.49% interest Ferk Family already had in Med-Rite). The breach of contract claim alleged that Ferk Family materially breached the Operating Agreement, which prohibited the transfer of such interest absent "prior written consent of the Members holding a Majority-in-Interest of the Interests;" and which required the tendering of a Right of First Offer Notice to plaintiffs before the transfer of Mas-Rite's interest to Ferk Family.

These same allegations were made in the breach of implied covenant count, and both the breach of contract and breach of implied covenant counts sought damages. The specific performance count sought for the defendants to accept the plaintiffs' election to purchase Mas-Rite's interest in Med-Rite, and asserted that "money damages alone would be an inadequate remedy to compensate Plaintiffs for Defendants' material breaches of the Operating Agreement."

Defendant Ferk Family contended below, and on appeal, that Med-Rite's Operating Agreement restricts only a transfer of interests in Med-Rite, and therefore, had no effect on Melendez's transfer of his interest in Mas-Rite to Ferk Family. We agree.

In its summary judgment order, the trial court determined that the transfer provisions of the Operating Agreement in section nine applied and controlled, and therefore the attempted transfer of Mas-Rite's interests in Med-Rite to Ferk Family was void because Mas-Rite failed to comply with the provisions. The court also concluded that the Operating Agreement's Right of First Offer applied and Gail Frank and the other plaintiffs were entitled to specific performance.

We review the court's determinations on summary judgment de novo, Volusia Cty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000), and conclude that the trial court erred in its determination that the plaintiffs below were entitled to summary judgment on their claims for breach of contract, breach of fiduciary duty, and specific performance.

Article IX of the Operating Agreement provides:

**TRANSFERS OF INTERESTS OF MEMBERS**

**9.1 General Provisions.**

(a) Except as otherwise set forth in this Agreement or as otherwise provided in the Act, a Member[5] may not Transfer[6] his, her or its Interest in the Company without the prior written consent of the Members holding a Majority-in-Interest[7] of the Interests[8] (which

---

[5] The term "Member" or "Members" is defined as "the persons and/or entities whose names appear on Exhibit A annexed hereto." Exhibit A identifies Larry Ferk, Gail Frank, Mas-Rite, LLC, Alternative Technologies International, Inc., Swastic Kaveeshwar Srihari, and Joe and Connie Mitchell.

[6] The term "Transfer" is defined as "the mortgage, pledge, transfer, sale, assignment, gift or other disposition, in whole or in part, of an Interest, whether voluntarily, by operation of law or otherwise."

consent to any Transfer may be withheld without any liability or accountability to any Person). Notwithstanding anything to the contrary in this Agreement, any Transfer of an Interest (a) in violation of the provisions of this Agreement . . . shall be void and shall not bind the Company.

(b) Notwithstanding anything in this Agreement to the contrary:

. . .

(ii) A Member that is a legal entity may Transfer all of its interest to any Affiliate.[9]

. . .

(c) Any Member making or permitting a Transfer allowed pursuant to any of the above permitted Transfers must send immediate written notice thereof to the Board of Management together with reasonable evidence that the conditions or restrictions applicable thereto as set forth above have been complied with. . . .

**9.2 General Conditions to Permitted Transfers.**

---

[7] The term "Majority-in-Interest" is defined as "the affirmative vote of the Members holding greater than 60% of the Percentage Interests or the affirmative vote or presence of greater than 60% of the Managers."

[8] The term "Interest" is defined as "the ownership interest of a Member in the Company as reflected on Exhibit A annexed hereto, as the same may, from time to time, be required to be amended."

[9] The term "Affiliate" is defined as "a Person that directly or indirectly through, one or more intermediaries, controls or is controlled by, or is under common control with the Person specified. For this purpose "control" of a Person means that power (whether or not exercised) to direct the policies, operations or activities of such Person by or through ownership of, or right to vote, or to direct the manner of voting of such Person, or pursuant to law, or agreement or otherwise. No Member shall be deemed to be an Affiliate of another Member by virtue of this Agreement or their respective ownership of Interests in the Company." The term "Person" includes "an individual, corporation, partnership, limited liability company, trust, unincorporated organization, association or other entity."

11

(a) No Transfer of an Interest permitted by the terms of this Agreement shall be effective unless:

(i) such Transfer shall have satisfied the provisions of Section 9.1;

. . .

**9.3 Right of First Offer.**

(a) Subject to Section 9.1(a) above, in the event that any Member desires to Transfer all or part of his, her or its Interests to an un-Affiliated third party (the "Offered Interests"), such Member (the "Selling Member") shall notify the Company and the other Members in writing of his, her, or its desire to effect such a Transfer and of the terms and conditions upon which such Selling Member would be willing to effect such a proposed Transfer (the "Right of First Offer Notice"). The Selling Member shall not be required to have obtained an un-Affiliated third party offer in this instance. The Right of First Offer Notice from the Selling Member to the Company and the other Members shall include a written offer to sell the Offered Interests to the Company or the other Members, pro-rata based on their relative Percentage Interests, at the price and on the terms and conditions specified in the Right of First Offer Notice.

. . .

It is undisputed that neither Melendez nor Mas-Rite complied with the Notice, Consent, or Right of First Offer provisions in the Operating Agreement. It is also undisputed that Mas-Rite's only asset was its 16.21% interest in Med-Rite, and that, by this transfer between Melendez and Ferk Family, Ferk Family obtained Mas-Rite's voting rights in Med-Rite. Importantly, Mas-Rite (the "Member"), retained its interest in Med-Rite.

Under the plain language of the Med-Rite Operating Agreement, Mas-Rite (a "Member") could not transfer its ownership interest in Med-Rite without prior written consent and without providing the requisite notice. However, the issue presented in this case is whether Melendez, who is not identified in the Operating Agreement as a "Member," violated the terms of the Operating Agreement by transferring his majority interest in Mas-Rite without following the dictates of the Med-Rite Operating Agreement.

Under well-established principles of contract interpretation, the clear and unambiguous terms of an agreement should be given their plain meaning and enforced accordingly. Hahamovitch v. Hahamovitch, 174 So. 3d 983 (Fla. 2015); Crawford v. Baker, 64 So. 3d 1246 (Fla. 2011); Sheen v. Lyon, 485 So. 2d 422 (Fla. 1986); Idearc Media Corp. v. M.R. Friedman and G.A. Friedman, P.A., 985 So. 2d 1159 (Fla. 3d DCA 2008); Anthony v. Anthony, 949 So. 2d 226 (Fla. 3d DCA 2007); BAC Intern. Credit Corp. v. Macia, 626 So. 2d 1037 (Fla. 3d DCA 1993). We conclude that Melendez was not required to comply with the Operating Agreement before transferring his own interest in Mas-Rite to the Ferk Family. He did not transfer Mas-Rite's interest in Med-Rite, and thus, the provisions of section nine in the Operating Agreement were never triggered. In finding otherwise, the trial court erred. Accordingly, we reverse and remand with instructions to enter

judgment in favor of Ferk Family on Counts III, IV, and V of the operative complaint.

b. **Did the trial court err in entering judgment against Ferk Family on its counterclaim/third-party claims?**

The claims raised by Ferk Family and Mas-Rite in their counterclaim and third-party claim against Gail Frank, Swastic Srihari, COJO Holdings, Joe Mitchell and the Estate of Walter Frank included: (I) breach of fiduciary duty arising out of the operation of Med-Rite and decision-making relative to said operation; (II) breach of contract, arising out of its reorganization and material changes to Med-Rite's business; (III) breach of implied covenant of good faith and fair dealing; (IV) breach of contract, arising out of the improper termination of Ferk from his position on the board of management and unauthorized loans to Med-Rite by Gail Ferk (alleged by Ferk Family only); and (V) breach of implied covenant of good faith and fair dealing (alleged by Ferk Family only).

Gail Frank, Swastic Srihari, COJO Holdings, Joe Mitchell and the Estate of Walter Frank contended that the counterclaims were derivative, not direct; were not viable under the business judgment rule; and that Ferk Family failed to establish a breach of the Operating Agreement, or a breach of the implied covenant of good faith and fair dealing as a matter of law. Following a bench trial, the trial court determined, *inter alia*:

14

1. Counter/third-party defendants did not breach the Operating Agreement in their removal of Larry Ferk as a manager;

2. Ferk Family and Mas-Rite's claims were solely derivative and could not be maintained as direct actions.

3. Florida's business judgment rule shielded counter/third-party defendants from liability;

4. Ferk Family and Mas-Rite failed to establish a breach of loyalty and care, and counter/third-party defendants exercised their business judgment in all relevant aspects; and

5. Ferk Family and Mas-Rite failed to establish the existence of damages arising from any alleged breach and failed to present a viable damage model.

We review the trial court's factual findings to determine whether there is competent substantial evidence to support those findings, and review the trial court's legal conclusions and contract interpretations de novo. Telemundo Media, LLC v. Mintz, 194 So. 3d 434, 435 (Fla. 3d DCA 2016); Pages v. Seliman-Tapia, 134 So. 3d 536, 538 (Fla. 3d DCA 2014).

**1. The removal of Larry Ferk from the Board of Management**

Ferk Family asserts on appeal that the trial court erred in its construction of the terms of the Operating Agreement with regard to Larry Ferk's removal from the Board of Management. Ferk Family contends that, under the terms of the Operating Agreement, a Manager cannot be removed from the Board unless 60% of the Members determine that the Manager should be removed. We agree with Ferk Family's interpretation of the Operating Agreement.

15

It is undisputed that at the time of Ferk's removal on June 28, 2012, the Members of Med-Rite were: Gail Frank, Ferk Family, COJO Holdings, Mas-Rite, and Swastic Srahiri. The Managers at that time were: Larry Ferk, Gail Frank, Walter Frank and Joe Mitchell. The letter terminating Larry Ferk was signed by Gail Frank, Walter Frank, and Joe Mitchell: 75% of the Managers, but the only "Member" who signed the letter was Gail Frank, who held a 28.99% interest in the Company. The sole issue then is whether the Operating Agreement authorized Ferk's removal by a determination of 75% of the Managers alone.

Article V, Section 5.1(e) of the Operating Agreement covers removal of a Manager:

> **Removals; Vacancies**. A Manager may be removed at any time from the Board of Management, including for "Cause" (as defined below) as determined by the Members holding a Majority in Interest. . . . For purposes of Article V, "Cause" shall mean fraud, willful misconduct, gross negligence, breach of fiduciary duty or other gross misconduct by a Manager with respect to a material matter relating to the affairs of the Company.

As discussed above, the term "Members" is defined as those "persons and/or entities whose names appear on Exhibit A:" Gail Frank, Ferk Family, COJO Holdings, Mas-Rite and Swastic Srahiri. However, the term "Majority-in-Interest" is defined as "the affirmative vote of the Members holding greater than 60% of the Percentage Interests **or the affirmative vote or presence of greater than 60% of the Managers.**" (Emphasis added).

16

The trial court construed this provision of the Operating Agreement to authorize the removal of Ferk (a Manager) for "Cause" as determined by **either** the Members holding greater than 60% of the Percentage Interest <u>or</u> the Members holding the "affirmative vote or presence of greater than 60% of the Managers."

We hold that the trial court erred in its construction of this portion of the Operating Agreement. Article I, section 1.1, the Definitions section of the Operating Agreement provides: "Unless otherwise expressly provided herein or **unless the context clearly requires otherwise**, the following terms as used in this Agreement shall have the following meanings:" (emphasis added). The definition of "Majority in Interest" is clearly one such instance which, when viewed in context, would allow for only one interpretation as it relates to removal of a Manager. The Agreement cannot be read to allow the removal of a Manager by the "affirmative vote or presence of greater than 60% of the Managers," because section 5.1(e) plainly authorizes removal only "by the **Members** holding a Majority in Interest."

This point is further illustrated, and placed in proper context, when one looks to other provisions of the Agreement, such as section 5.1(d), which deals with voting and quorums, and provides: "A quorum for the transaction of meetings of the Board of Management shall consist of a Majority-in-Interest of the

17

Managers present in person." In that context, it would make sense that "Majority-in-Interest" means more than 60% of the Managers.

By way of another example, section 5.2(a), which sets forth the authority of the Board of Management, provides: "Except with the consent of the Members holding a Majority-in-Interest of the Interests, the Board of Management shall not: (i) Enter into a merger, consolidation, recapitalization or other reorganization of the Company or a sale of all or substantially all of the Company's assets. . . ." If we employed the trial court's interpretation, 60% of the Managers (as the trial court would define "Members holding a Majority-in-Interest") could take action, such as selling substantially all of the Company's assets, without consent of 60% of the <u>Members</u>. This would render the limitations on the Board's authority completely meaningless because a majority of the Managers could take any action they saw fit, including actions which under the Operating Agreement are reserved solely to the <u>Members</u> with a Majority-in-Interest.

Accordingly, the trial court erroneously determined that there was no breach of contract arising out of Ferk's removal.[10] We conclude that, under the terms of the Operating Agreement, this determination was required to be made by the Members who collectively held at least a 60% interest in the company. The termination letter was signed by only one member – Gail Frank, whose interest

---

[10] We note that Ferk has not challenged the "for cause" determination itself.

18

was 28.99%. And even if we attribute COJO Holding's 24.90% membership interest to Joe Mitchell (COJO Holding's president), this nevertheless fails to reach the requisite 60%.[11]

### 2. The determination that Ferk Family's and Mas-Rite's claims were solely derivative and could not be maintained as direct actions

Even if this conduct constituted a breach of contract, we must still determine whether affirmance is nonetheless warranted due to the trial court's additional finding that Ferk Family's claims were derivative, and therefore, not cognizable in Florida. Generally, although a shareholder may bring a derivative action on behalf of an injured corporation, a shareholder may only bring a direct action individually under certain limited circumstances.

In Dinuro Investments, LLC v. Camacho, 141 So. 3d 731 (Fla. 3d DCA 2014), this court analyzed Florida law with regard to whether a member of an LLC has standing to bring an action individually against other members of the LLC (as opposed to bringing a derivative action on behalf of the company). We held that such "an action may be brought directly only if (1) there is a direct harm to the shareholder or members such that the alleged injury does not flow subsequently from an initial harm to the company **and** (2) there is a special injury to the shareholder or member that is separate and distinct from those sustained by the

---

[11] Walter Frank, the third signatory to the termination letter, had 0% interest in the company at the time of Ferk's termination.

19

other shareholders or members.  Id. at 739-40 (citing Citizens Nat'l Bank of St. Petersburg v. Peters, 175 So. 2d 54, 56 (Fla. 2d DCA 1965)).  However, Camacho also held that there is an exception to this rule under Florida law:  "A shareholder or member need not satisfy this two-prong test when there is a separate duty owed by the defendant(s) to the individual plaintiff under contractual or statutory mandates." Camacho, 141 So. 3d at 740.

Ferk Family asserts that its claims against the counter/third-party defendants were authorized under Florida law because not only was there the requisite direct harm and special injury to Ferk Family but, in addition, its claims qualified for the exception because under the Operating Agreement, Members are expressly permitted to bring suit against one another directly for breach of its provisions, and further, the Members owed Ferk Family a statutory duty under section 608.4225(1), as alleged by Ferk Family in its count for breach of the duty of loyalty and due care.

Section 11.12 of the Agreement provides:

> **Additional Remedies.**  The rights and remedies of the Members shall not be mutually exclusive.  The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but ***nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any Member aggrieved as against the other Members, for breach or threatened breach of any provision thereof***, it being the intention of this Section to make clear the

> agreement of the Members that their obligations
> hereunder shall be enforceable in equity as well as at law
> or otherwise.

(Emphasis added in bold italics).

In Camacho, 141 So. 3d at 742, which held that the plaintiff's claims should have been brought as a derivative action, this court specifically noted that "[c]onspicuously missing from the operating agreement is any provision stating that the members shall be directly liable to each other for breaches of the terms of the operating agreement." For that reason, we held that the shareholder in that case could not bring its direct action.

However, in the present case, the Operating Agreement unequivocally provides that Members who are aggrieved by other Members may bring direct claims for breach of the provisions of the Operating Agreement.

Interestingly, the Camacho opinion cited to section 608.4227(1), Florida Statutes (2011) for the proposition that "members are typically shielded from individual liability for their involvement with an LLC unless the terms of the articles of incorporation or the operating agreement provide otherwise." However, shortly after the Camacho opinion was released, section 608.4227 was repealed, and in its place, effective January 1, 2015, was Florida's Revised Limited Liability Company Act (Chapter 605).

21

This provisions of the Revised LLC Act apply to the instant case. Specifically, section 605.0801, Florida Statutes (2016), titled "Direct action by member," provides:

(1) Subject to subsection (2), a member may maintain a direct action against another member, a manager, or the limited liability company to enforce the member's rights and otherwise protect the member's interests, including rights and interests under the operating agreement of this chapter or arising independently of the membership relationship.

(2) A member maintaining a direct action under this section must plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company.

It might appear at first blush that this statute eliminated the exception, recognized by this court in Camacho, and instead requires the member to plead and prove both direct harm and special injury. However, upon considering section 605.0105, relating to LLC operating agreements, it is clear that the exception recognized in Camacho remains viable:

(1) **Except as otherwise provided in subsections (3) and (4), the operating agreement governs the following**:
(a) **Relations among the members as members** and between the members and the limited liability company.
(b) The rights and duties under this chapter of a person in the capacity of manager.
(c) The activities and affairs of the company and the conduct of those activities and affairs.

(d) The means and conditions for amending the operating agreement.

(2) **To the extent <u>the operating agreement does not otherwise</u> provide for a matter described in subsection (1), this chapter governs the matter.**

(3) **An operating agreement may not do any of the following**:

(a) **Vary a limited liability company's capacity under s. 605.0109 to sue and be sued in its own name**.

(b) Vary the law applicable under s. 605.0104.

(c) Vary the requirement, procedure, or other provision of this chapter pertaining to:

1. Registered agents; or

2. The department, including provisions pertaining to records authorized or required to be delivered to the department for filing under this chapter.

(d) Vary the provisions of s. 605.0204.

(e) Eliminate the duty of loyalty or the duty of care under s. 605.04091, except as otherwise provided in subsection (4).

(f) Eliminate the obligation of good faith and fair dealing under s. 605.04091, but the operating agreement may prescribe the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable.

(g) Relieve or exonerate a person from liability for conduct involving bad faith, willful or intentional misconduct, or a knowing violation of law.

(h) Unreasonably restrict the duties and rights stated in s. 605.0410, but the operating agreement may impose reasonable restrictions on the availability and use of information obtained under that section and may define appropriate remedies, including liquidated damages, for a breach of a reasonable restriction on use.

(i) Vary the grounds for dissolution specified in s. 605.0702.

(j) Vary the requirement to wind up the company's business, activities, and affairs as specified in s. 605.0709(1), (2)(a), and (5).

(k) **Unreasonably restrict the right of a member to maintain an action under ss. 605.0801-605.0806.**

(Emphasis added).

Under section 605.0105(2), the statute governs only where the operating agreement does not otherwise provide for that matter and, under subsection (3)(a), although an operating agreement may not vary an LLC's capacity to sue or be sued, there is no similar provision regarding a member's right to sue under the operating agreement. Further, under subsection (3)(k), an operating agreement may not unreasonably restrict such right of action. Thus, the plain language of the statute clearly provides that a member may still bring a direct action against another member where the operating agreement so provides, and thus, the exception under Camacho remains applicable under Florida law.

Both this court and the Fourth District have continued to follow Camacho and recognize the existence of an exception. See Demir v. Schollmeier, 199 So. 3d 442 (Fla. 3d DCA 2016) (continuing to apply Camacho but finding that the exception did not apply in that case); Strazzulla v. Riverside Banking Co., 175 So. 3d 879 (Fla. 4th DCA 2015). See also Fritz v. Fritz, 219 So. 3d 234 (Fla. 3d DCA 2017) (recognizing, though not applicable to the instant case, the existence of the

24

exception in a partnership case where section 620.2001(2) (partnership law) is similar to the Revised LLC Act).

Accordingly, we find merit in Ferk Family's arguments and hold that, under Florida law, it met the exception to the rule against bringing direct claims, and was therefore not required to satisfy the two-prong direct harm/special injury test.[12]

### 3. Application of the Business Judgment Rule

Notwithstanding our determinations (favorable to Ferk Family) regarding the construction of the Operating Agreement and Ferk Family's ability to bring a direct claim, we affirm the final judgment against Ferk Family on its counterclaim and third-party claim, because the trial court correctly determined that all of the claims brought by Ferk Family (including the claim arising out of Larry Ferk's removal as manager) were barred by the business judgment rule.[13]

The business judgment rule, codified in section 608.4228, Florida Statutes (2012)[14] provides:

> (1) A manager or a managing member shall <u>not be</u> <u>personally liable for monetary damages</u> to the limited

---

[12] We therefore need not reach the additional argument, made by Ferk Family, that it alleged and established a direct harm and special injury.

[13] Ferk Family sought only money damages in connection with its claim arising out of Larry Ferk's wrongful removal. Ferk Family did not seek equitable relief, such as returning Larry Ferk to his position on the management board. Therefore, and as discussed below, the business judgment rule applies.

[14] The statute has since been renumbered to section 605.04093, Florida Statutes (2016), but there is no meaningful difference in the relevant portions of the two statutes.

liability company, <u>its members</u>, or any other person <u>for any statement, vote, decision, or failure to act regarding management or policy decisions by a manager</u> or a managing member unless:

(a) The manager or managing member <u>breached or failed to perform the duties as a manager</u> or managing member; <u>and</u>

(b) The manager's or managing member's breach of, or failure to perform, those duties constitutes any of the following:

1. A violation of the criminal law, unless the manager or managing member had a reasonable cause to believe his or her conduct was lawful or had no reasonable cause to believe such conduct was unlawful. A judgment or other final adjudication against a manager or managing member in any criminal proceeding for a violation of the criminal law estops that manager or managing member from contesting the fact that such breach, or failure to perform, constitutes a violation of the criminal law, but does not estop the manager or managing member from establishing that he or she had reasonable cause to believe that his or her conduct was lawful or had no reasonable cause to believe that such conduct was unlawful.

2. A transaction from which the manager or managing member derived an <u>improper personal benefit</u>, either directly or indirectly.

3. A distribution in violation of s. 608.426

4. In a proceeding by or in the right of the limited liability company to procure a judgment in its favor or by or in the right of a member, conscious disregard of the best interest of the limited liability company, or willful misconduct.

5. In a proceeding by or in the right of someone other than the limited liability company or a member, recklessness or an act or omission which was committed

in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

(2) For the purposes of this section, the term "recklessness" means acting, or failing to act, in conscious disregard of a risk known, or so obvious that it should have been known, to the manager or managing member, and known to the manager or managing member, or so obvious that it should have been known, to be so great as to make it highly probable that harm would follow from such action or failure to act.

(3) A manager or managing member is deemed not to have derived an improper personal benefit from any transaction if the transaction and the nature of any personal benefit derived by the manager or managing member are not prohibited by state or federal law or the articles of incorporation or operating agreement and, without further limitation, the transaction and the nature of any personal benefit derived by a manager or managing member are disclosed or known to the members, and the transaction was authorized, approved, or ratified by the vote of a majority-in-interest of the members other than the managing member, or the transaction was fair and reasonable to the limited liability company at the time it was authorized by the manager or managing member, notwithstanding that a manager or managing member received a personal benefit.

(4) The circumstances set forth in subsection (3) are not exclusive and do not preclude the existence of other circumstances under which a manager will be deemed not to have derived an improper benefit. (Emphasis added).

See Lobato-Bleidt v. Lobato, 688 So. 2d 431, 434 (Fla. 5th DCA 1997)

(noting that "under the 'business judgment' rule, a board of directors is given wide

discretion to make decisions and a court generally will not substitute its judgment for that of the directors."). Upon our review, we hold that the trial court properly applied the business judgment rule, and the trial court's determination that the counter- and third-party defendants exercised business judgment in the complained-of actions is supported by competent substantial evidence.[15],[16]

## IV.  CONCLUSION

We affirm the final judgment entered in favor of Gail Frank, COJO Holdings, Joe Mitchell, Swastic Srihari and the Estate of Walter Frank on Ferk Family's counterclaims and third-party claims. We reverse the final summary judgment entered in favor of Gail Frank, COJO Holdings and Swastic Srihari on their Second Amended Complaint and remand for further proceedings consistent with this opinion.

---

[15] We reject without further discussion Ferk Family's additional argument that the Operating Agreement provided for a higher standard of care than that required under the business judgment rule.

[16] Because we affirm on the basis of the trial court's proper application of the business judgment rule, we do not reach the remaining points raised on appeal by Ferk Family.