SAGARRA INVERSIONES, S.L.,
Plaintiff Below, Appellant,

v.

CEMENTOS PORTLAND VALDER-
RIVAS, S.A., et al., Defendants
Below, Appellees,

Uniland Acquisition Corporation,
Nominal Defendant.

No. 425, 2011.

Supreme Court of Delaware.

Submitted: Nov. 23, 2011.
Decided: Dec. 28, 2011.

Arthur L. Dent and Scott Czerwonka, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: John Fornaciari (argued), Robert Disch and Jeremy Keim, Esquires, of Baker Hostetler L.L.P., Washington, D.C.; for Appellant.

Paul J. Lockwood (argued) and Rachel J. Barnett, Esquires, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Of Counsel: Jay B. Kasner, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice:

The appellant, Sagarra Inversiones, S.L. ("Sagarra"), a Spanish corporation, is a minority shareholder of Corporación Uniland S.A. ("Uniland"), also a Spanish corporation. Sagarra brought a Court of Chancery action to rescind the sale, by Cementos Portland Valderrivas ("CPV"), of Giant Cement Holdings, Inc. ("Giant"), to Uniland. CPV was the controlling stockholder of both Giant and Uniland. Sagarra purported to sue derivatively on behalf of a wholly-owned Delaware subsidiary of Uniland, Uniland Acquisition Corp. ("UAC"), which was specifically created as the vehicle to acquire Giant. Sagarra claimed that the transaction was unfair and the product of self-dealing and, therefore, a breach of fiduciary duty owed under to UAC under Delaware law by UAC's directors, who were aided and abetted by CPV and Uniland.

The defendants moved to dismiss the complaint on the ground that Sagarra lacked standing to enforce a claim on behalf of UAC. The Court of Chancery held that Sagarra's standing to sue (specifically, its obligation to make a pursuit demand on UAC's parent company board) was governed by Spanish law, because Uniland—the only entity in which Sagarra owns stock—was incorporated in Spain. Because Sagarra failed to satisfy the demand requirements of Spanish law, the Court of Chancery dismissed Sagarra's action. We uphold the Court of Chancery's reasoning and judgment, and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

### A. The Parties

Uniland is a business entity formed under Spanish law. CPV, a Spanish entity

---

1. The facts recited herein are derived from Sagarra's complaint and from the Opinion of the Court of Chancery.

that is Uniland's majority (74%) stockholder, controls Uniland's board of directors (the "Board"). Sagarra is the sole minority (26%) stockholder of Uniland, and has one director that represents its interests on the Uniland board. As noted, CPV was also the controlling shareholder of Giant, the corporation Uniland acquired (through UAC) in the transaction at issue in this lawsuit.

Two Uniland subsidiaries were involved in the Giant transaction. The first was Uniland International B.V. ("Uniland B.V."), a Dutch holding company that was wholly owned by Uniland. The second was UAC, a wholly-owned Delaware subsidiary of Uniland B.V. UAC was the acquisition vehicle for the Giant transaction. Thus, and as illustrated by the chart on the following page, within this hierarchy UAC was a third-tier subsidiary of Uniland.[2]

## B. *The Giant Acquisition*

In 2009, Giant and its controlling stockholder, CPV, found themselves in financial distress. To improve its financial picture, CPV attempted to dispose of Giant for $270 million and sought out potential acquirers at that price, but without suc-

---

**2.** In this Opinion, and unless otherwise indicated, the term "parent corporation" refers only to the corporate entity in which the plaintiff shareholder actually holds shares (here, Uniland), and the term "subsidiary" refers to the last inferior corporate entity in the hierarchical chain (here, UAC). Any subsidiary interposed between the parent and the ultimate subsidiary is sometimes referred to as an "intermediate" subsidiary (here, Uniland B.V.).

cess. During this period, Uniland's intermediate subsidiary, Uniland B.V., realized approximately $188 million from the sale of certain of its businesses. Sometime thereafter, CPV decided that Uniland would acquire Giant. Sagarra claims that CPV's motivation for that decision was that the sale would enable CPV to access Uniland B.V.'s $188 million for itself, while simultaneously forcing Uniland's minority shareholder, Sagarra, to share the risk of Giant's financial distress.

In September 2010, CPV proposed to Uniland's Board of Directors that Uniland B.V. acquire Giant for $278 million. Sagarra's Board representative opposed CPV's proposal. Presumably in an effort to placate Sagarra, the investment bank, UBS, was retained to perform an independent valuation of Giant. But, CPV later directed UBS to suspend its valuation, and instead provided Sagarra a March 2010 PricewaterhouseCoopers ("PWC") study that valued Giant at $700 million. Sagarra's representative objected to the PWC study as overstating Giant's value. Evidently that objection was not fanciful: UBS later rendered an opinion that an appropriate purchase price would fall within a range between $66 million and $151 million.

CPV eventually ceased its efforts to obtain Sagarra's assent to its proposal and, on December 28, 2010, caused the acquisition of Giant to proceed. The next day, over the opposition of Sagarra's lone Board representative, a majority of Uniland's Board (who represented CPV's interests) approved the transaction at a price of $279 million, payable in installments. On December 30, 2010, a stock purchase agreement ("SPA") was executed to document the terms of the transaction. The record discloses that at least two of the four installment payments required by the SPA have been made; the third payment is scheduled to occur in January 2012.

### C. Sagarra Challenges The Giant Transaction

Sagarra then attempted to halt the Giant transaction in litigation that Sagarra brought in both Spain and Delaware. In January 2011, Sagarra filed a special statutory proceeding in the Spanish courts to nullify the Board's vote approving the acquisition of Giant. According to Sagarra, if that lawsuit ultimately succeeds, then under Spanish law, Sagarra must prosecute a second action to rescind the SPA. Sagarra estimates that these Spanish legal proceedings (including any appeals) may not be finally resolved until 2020.

In February 2011, Sagarra filed this action in the Delaware Court of Chancery, purporting to assert both "multi-tier" derivative claims, and two direct claims, all frontally challenging the validity of the Giant transaction. In an August 5, 2011 Opinion and Order, the Vice Chancellor dismissed all of Sagarra's derivative claims on the ground that Sagarra lacked standing under Spanish law to sue derivatively. As for Sagarra's two direct claims, the court held that one was actually derivative in nature, and therefore was dismissed for lack of standing. The other direct claim was dismissed on *forum non conveniens* grounds, under *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co. ("McWane").*[3] The dismissal of the direct claim under *McWane* is not challenged on this appeal.

Addressing whether Sagarra had standing to assert its claims derivatively, the Court of Chancery determined that Spanish law governed that issue, and that Sagarra lacked standing under Spanish law, which required Sagarra to request the Uniland Board to convene a meeting of its

---

3. 263 A.2d 281 (Del.1970).

shareholders to decide whether Uniland should bring suit against its own Board. If Sagarra made that request but no shareholders' meeting were called, then Sagarra would have standing to proceed derivatively on Uniland's behalf. But, because Sagarra had never requested the Uniland Board to schedule a shareholders' meeting, the court held that Sagarra had not satisfied the Spanish law standing requirements for proceeding derivatively. On that basis, the court dismissed all the derivative claims.[4]

This appeal followed.

## II. ANALYSIS

### A. Sagarra's Claims Of Error

Sagarra's principal claim on this appeal is that the Court of Chancery erred in determining that Spanish law governed the derivative standing requirements applicable to Sagarra. Instead, Sagarra contends, the Court of Chancery should have applied Delaware law, specifically Delaware's presuit demand jurisprudence including its "demand futility" doctrine. Sagarra advances three, somewhat overlapping, reasons for this position. First, Sagarra contends that it is suing to enforce a right possessed by UAC, which is a Delaware corporation. Although Sagarra concedes that UAC is a third-tier subsidiary of the entity in which Sagarra holds stock (Uniland), Sagarra urges that Delaware "tailor[s] ... multi-tier derivative" standing based on "equitable" principles, to "ensure that breaches of duty by directors of a Delaware subsidiary cannot escape judicial review." Second, Sagarra

argues that a proper application of the internal affairs doctrine requires the application of Delaware's derivative standing rules, because the right Sagarra seeks to enforce "is not a right created in any way by Spanish law." Rather, that right "arose [under Delaware law] when Uniland SA incorporated a subsidiary in Delaware.... [The] Delaware subsidiary's board [therefore] breached their [fiduciary] duties in effectuating that transaction."[5] Third, Sagarra urges that sound public policy compels the result it asks us to reach here.

■ This Court reviews a trial court's grant of a motion to dismiss de novo.[6] We conclude, as did the Court of Chancery, that Sagarra lacks standing to assert these claims. Sagarra seeks to enforce claims of UAC, a wholly-owned subsidiary of which Uniland is (for purposes of this case) the ultimate parent. Sagarra, however, owns no shares of UAC. It holds shares only in Uniland. To have standing to assert Uniland's claim "triple" derivatively on behalf of UAC, Sagarra must first satisfy the derivative standing requirements that apply to the parent entity in which Sagarra owns shares—here, Uniland. Because the standing issue is one that involves Uniland's "internal affairs," that makes applicable the internal affairs doctrine, which requires a Delaware court to apply the law of Uniland's state (or, in this case, country) of incorporation—here, Spain. It therefore is Spanish law that prescribes the standing requirements that apply to Sagarra, and it is undisputed that Sagarra failed to satisfy those requirements.

---

**4.** Because the Court of Chancery correctly held that Spanish law governs the standing issue, we do not reach the Appellees' alternative contention that the claims were also properly dismissed under *McWane*.

**5.** Sagarra describes the "issue presented in this case" as "a matter of first impression" for this Court.

**6.** *Ramirez v. Murdick*, 948 A.2d 395, 399 (Del. 2008); *Vanderbilt Income and Growth Associates L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612 (Del.1996).

### B. *The Application Of Delaware's "Double Derivative" Standing Jurisprudence*

 Delaware law has long recognized that a shareholder of a parent corporation may bring suit derivatively to enforce the claim of a wholly owned corporate subsidiary, where the subsidiary and its controller parent wrongfully refuse to enforce the subsidiary's claim directly.[7] Such actions are commonly referred to as "double derivative" actions. This case, however, goes one step beyond being double derivative, because it involves an additional, intermediate subsidiary. Actions of that latter kind have been described as "multi-tier" or "multiple" derivative litigation.[8] Although the terminology used to describe these kinds of multi-tier derivative actions may change, under Delaware law the applicable principles of derivative standing remain constant. If those standing requirements are satisfied, a shareholder of the parent corporation may "stand in the shoes"[9] of the parent, and prosecute, on the parent's behalf, claims that formally belong to the parent's wholly owned subsidiary.[10] Those standing principles are

---

**7.** *See Sternberg v. O'Neil*, 550 A.2d 1105, 1107 n. 1 (Del.1988) (defining a "double derivative" action as "a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company."). *See also, Levine v. Milton*, 219 A.2d 145, 146 (Del.Ch.1966); *Leibert v. Grinnell Corp.*, 194 A.2d 846, 847 (Del. Ch.1963) ("[Plaintiff] apparently proceeds on a double derivative theory."). The precise significance of the "double" in "double derivative" actions appears to vary over time and jurisdiction. The unifying thread, however, is simple: two layers (or "tiers") of corporate entities are implicated in the suit. *See, e.g., Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 910 n. 5 (11th Cir.1998) ("[A] double-derivative action ... rests upon the idea that the injury to plaintiffs' corporation results from injuries to another corporation."); *In re Imperial Corp. of Am.*, 92 F.3d 1503, 1510 n. 10 (9th Cir. 1996) ("The shareholder is, in effect, maintaining a derivative action on behalf of the subsidiary, since the holding or parent company has derivative rights to the cause of action possessed by the subsidiary.") (citation omitted); *U.S. Lines v. U.S. Lines Co.*, 96 F.2d 148, 151 (2d Cir.1938) ("The justification for allowing a double derivative suit like the present to be maintained is that *both* [the parent and subsidiary] ... were in the *control* of those charged with inflicting the corporate injury.") (emphasis added); Note, *Remedies of Stockholder of Parent Corporation for Injuries to Subsidiaries*, 50 Harv. L.Rev. 963, 964–65 (1937) (conceiving of "double derivative" suit as an "an extension of ... the *Benedict* case,"

which addressed concerns over "double liability") (citing *General Rubber Co. v. Benedict*, 215 N.Y. 18, 109 N.E. 96 (N.Y.Ct.App.1915)). *See also, Saltzman v. Birrell*, 78 F.Supp. 778, 783 (S.D.N.Y.1948) ("There is no sound reason why, if a double derivative [action] is permissible, a triple derivative [action] should not be....."); 13 Fletcher Cyc. Corp. § 5977 ("A triple derivative action may be brought to enforce a cause of action of a subsidiary of a subsidiary.") (citing *Tomran, Inc. v. Passano*, 159 Md.App. 706, 862 A.2d 453, 454 (2004) (terming a suit to enforce a claim through three tiers of entities to be "triple derivative")).

**8.** *See, e.g., In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *1 (Del.Ch. Apr. 18, 2001) ("The premise of [defendants'] argument is that the claims at issue do not belong to Sunstates Corporation but to one or more of its foreign subsidiaries and may only be asserted in a double or multiple derivative suit."). *But see supra* note 7 (citing authorities using term 'triple derivative').

**9.** *Lambrecht v. O'Neal*, 3 A.3d 277, 289 (Del. 2010).

**10.** As we observed in *Lambrecht*, some courts in other jurisdictions have recognized a double derivative right in the case of a less-than-wholly-owned subsidiary, but Delaware courts have not yet ruled on that issue. 3 A.3d at 283, n. 14. We do not reach that issue in this Opinion, since all of the relevant corporate subsidiaries here are wholly owned.

the same, whether the subsidiary whose claim is being enforced falls within the second tier, or even further down the corporate hierarchical chain, separated from the parent by one or more intermediate subsidiaries.

## C. Parent Level Standing Is Required To Enforce A Subsidiary's Claim Derivatively

■ Sagarra's standing to sue derivatively on behalf of UAC must necessarily derive from its ownership of shares of Uniland, because Uniland is the only corporation in which Sagarra owns shares. Without that ownership stake, Sagarra would have no basis to claim standing to sue on behalf of any entity within the Uniland corporate hierarchy. Under Delaware law, a shareholder that holds shares only in a parent corporation must establish its standing to proceed derivatively at the parent level, in order to claim standing to enforce, on the parent's behalf, a claim belonging to that parent's Delaware subsidiary.[11]

On that point our law is settled. As we recently held in *Lambrecht v. O'Neal,* where "the wholly-owned subsidiary pre-existed the alleged wrongdoing . . . and the plaintiff owns stock only in the parent . . . [a demand can] only be made—and a derivative action [can] only be brought—at the parent, not the subsidiary, level."[12] As *Lambrecht* recognized, the underlying basis for double derivative standing is the parent's ability to "enforce [the subsidiary's] claim by the direct exercise of [the parent's] 100 percent control" of the subsidiary.[13] Applying that principle here, Sagarra's standing to sue derivatively, including its presuit demand obligations, is

11. *Rales v. Blasband,* 634 A.2d 927, 932–35 (Del.1993); *Lambrecht,* 3 A.3d at 282.

12. *Id.*

13. *Id.* at 288–91. We take this occasion to correct three pronouncements in *Hamilton Partners, L.P. v. Englard,* 11 A.3d 1180 (Del. Ch.2010), in which the Court of Chancery suggested, by way of dictum, that from a "corporate technician ['s]" standpoint, some language in *Lambrecht* is inconsistent with provisions of the Delaware General Corporation Law. *Id.* at 1203–05. Those assertions warrant comment, lest this Court's silence be regarded as tacitly blessing *Hamilton Partners'* characterization of *Lambrecht* as containing "technical missteps." *Id.* at 1206.

First, the *Hamilton Partners* court—presumably addressing a supposed contrary suggestion in *Lambrecht*—asserts that where a corporation is acquired in a reverse triangular merger, "[p]ost-merger, only the board of directors *of the subsidiary* has statutory authority over the [corporation's] derivative claim[s]." *Id.* at 1204–05 (citing 8 *Del. C.* § 141(a)) (emphasis in original). That statement, as phrased, is incorrect. Although the subsidiary's board has the sole statutory authority to decide whether or not to cause the subsidiary to assert the acquired claim *directly,* it is not accurate to say that the board has *exclusive* post-merger authority "over the *derivative* claim." By definition a derivative claim implicates the equitable right of a shareholder to assert the claim on the subsidiary's behalf. The subsidiary's board has the statutory "authority *to choose* whether [or not] to pursue the litigation," *Zapata Corp. v. Maldonado,* 430 A.2d 779, 786 (Del.1981) (emphasis added), but in the *derivative* context that authority is not exclusive, because where a shareholder has legitimate standing to proceed derivatively, the board's managerial decision not to sue will "not [be] respected." *Id.*

Second, and relatedly, *Hamilton Partners* implies that *Lambrecht* stands for the "statutorily incorrect" proposition that a parent corporation may assert (post-merger) a subsidiary's claim directly. 11 A.3d at 1205 (stating that a parent corporation in a triangular merger "does not receive the right to sue as a result of the merger and cannot assert directly the right of the subsidiary"). *Lambrecht* stands for no such proposition: it states only that the parent, as a practical matter and by virtue of its 100% control, can cause its wholly owned subsidiary to enforce its claim directly. *Lambrecht,* 3 A.3d at 288 (describing the "direct exercise of . . . 100 percent control").

Third, *Hamilton Partners,* citing *Lewis v. Anderson,* 477 A.2d 1040 (Del.1984), suggests that because the acquired claim is a statutory "asset" of the subsidiary and is subject to the subsidiary's board's managerial authority, the

governed by the derivative standing rules that apply at the parent (Uniland) level.[14]

## D. Standing Requirements Governed By The Internal Affairs Doctrine

■ That brings us to the next issue, which is: what body of standing law applies at the parent company level—the law of Delaware (as Sagarra claims) or of Spain (as the Vice Chancellor held)? That question must be resolved under the governing choice of law principle, which in Delaware is the internal affairs doctrine.[15] Under that doctrine and in this context,

the rule of decision is that of the jurisdiction of incorporation of the entity in which the plaintiff owns shares—here, Spain. Sagarra does not dispute that principle. Instead, it contends that the presuit demand requirement should not be deemed an "internal affair" of Uniland that falls within the scope of the internal affairs doctrine. Our law holds precisely the contrary.

■ In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle.[16] An important rationale for the doctrine is that,

parent has no property interest in that claim. *Hamilton Partners*, 11 A.3d at 1204 (asserting that *Lambrecht* "is inaccurate to cite a 'legal precept, confirmed in *Lewis v. Anderson* ... that as a result of [a reverse triangular] merger, [the acquired subsidiary's] claim becomes the property of [the parent] as a matter of statutory law."). That suggestion misreads *Lewis*, where this Court stated that "[t]he Chancellor ruled that plaintiff [shareholder's] ... underlying claim [post-merger] thereby became the exclusive property right of [the subsidiary] *and its sole shareholder*, [the parent corporation]. We agree...." 477 A.2d at 1042 (emphasis added).

The "parent-has-no-property-interest" conclusion that *Hamilton Partners* attributes to *Lewis*, is also a *non-sequitur*. In *Lewis*, after the triangular merger the resulting subsidiary became the sole statutory "owner" of the acquired corporation's claim. But that fact did not (nor could it) operate to negate or extinguish any interest in that claim that the corporate parent (as 100% owner of the resulting subsidiary) acquired. Post-merger, the parent had an indirect property interest or right in that claim that it did not have before the merger. *See Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 686–87 (Del.1959) (describing parent corporation's property interest in subsidiary's corporate assets as an "indirect interest" which creditors of parent cannot reach directly, absent fraud). The significance of the subsidiary's exclusive ownership of the claim—for double derivative standing purposes—is not that it negates any property interest of the parent. Rather, its significance is that the parent's indirect property interest in the claim is subject to the subsidiary's board's discretionary power to

decide whether to enforce that claim. But, even so, as we recognized in *Lambrecht* (and the Court of Chancery recognized in *Hamilton Partners*), as a practical matter the parent can always use its 100% controlling position to cause the subsidiary to enforce its claim, even though that claim is, statutorily speaking, the "property" of the subsidiary.

14. *See also, Sternberg v. O'Neil*, 550 A.2d 1105, 1122–23 (Del.1988) (acknowledging that because parent corporation "is an Ohio corporation, Ohio law must be applied to one aspect of [the plaintiff's] ... double derivative action."); *Kostolany v. Davis*, 1995 WL 662683, at *3 (Del.Ch. Nov. 7, 1995) ("Delaware does have a strong interest in protecting minority stockholders of Delaware corporations. However, plaintiff is a stockholder of the Dutch parent, not of the Delaware subsidiaries.").

15. *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del.1987) ("Delaware's well established conflict of laws principles require that the laws of the jurisdiction of incorporation ... govern this dispute involving [the internal affairs of the corporation].").

16. *Id.* at 216–17 ("The alternatives [to the internal affairs doctrine] present almost intolerable consequences to the corporate enterprise and its managers.... Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs."). Under our case law the doctrine is also a rule of constitutional law. *Id.* at 217–19 ("[W]e conclude that application of the internal affairs

"in order to prevent corporations from being subjected to inconsistent legal standards, the authority to regulate a corporation's internal affairs should not rest with multiple jurisdictions."[17] The term "internal affairs" encompasses "those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders."[18] The doctrine requires that the law of the state (or, in this particular case, the sovereign nation) of incorporation must govern those relationships.[19]

The presuit demand requirement is quintessentially an "internal affair" that falls within the scope of the internal affairs doctrine. As this Court explained in *Aronson v. Lewis*, the presuit demand requirement serves a core function of substantive corporation law, in that it allocates, as between directors and shareholders, the authority to sue on behalf of the corporation.[20] "[T]he entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability."[21] "The decision to bring a lawsuit or to refrain from litigating a claim on

behalf of a corporation is a decision concerning the management of the corporation."[22] The United States Supreme Court echoed that principle in *Kamen v. Kemper Fin. Serv. Inc.* There, the Court stated that "the contours of the demand requirement—when it is required, and when excused—determine *who* has the power to control corporate litigation ... [and] relates to the allocation of governing powers within the corporation."[23]

Those "contours of the demand requirement" fall firmly within the gravitational pull of the internal affairs doctrine, and thus are determined by the law of the jurisdiction of incorporation of the entity on whose board a presuit "demand" is required. In this case, the law of Spain governs the presuit demand requirements that Sagarra must satisfy to sue derivatively on Uniland's behalf, to enforce the claim of Uniland's ultimate Delaware subsidiary, UAC.[24]

### E. *Public Policy Does Not Displace The Internal Affairs Doctrine*

■ Sagarra's final argument is that that rule should be set aside in this specific

---

doctrine is mandated by constitutional principles, except in 'the rarest situations.' ").

**17.** *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del.2005).

**18.** *Id.* at 1113. *See also, McDermott*, 531 A.2d at 214 (defining internal affairs as "matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders").

**19.** *VantagePoint Venture Partners*, 871 A.2d at 1113.

**20.** 473 A.2d 805, 811–12 (Del.1984).

**21.** *Id.* at 812.

**22.** *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.1990). Nor were these principles new at

the time *Aronson* and *Spiegel* were decided. As early as 1966, the Court of Chancery in *Levine v. Milton* concluded that "[i]f derivative actions on behalf of [a corporation incorporated in a foreign jurisdiction] ... are not permitted under the law of [that foreign jurisdiction], then I am satisfied that plaintiff's suit would have to be dismissed on that ground." 219 A.2d 145, 147 (Del.Ch.1966).

**23.** 500 U.S. 90, 101, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991).

**24.** Once standing to proceed derivatively is established, Delaware substantive law applies to adjudicate the Delaware subsidiary's claims against its directors. *See Sternberg v. O'Neil*, 550 A.2d 1105, 1123–24 (Del.1988) (holding that internal affairs doctrine "mandates the application of Delaware law to the internal operation of [a subsidiary incorporated in Delaware]").

case for policy reasons. Sagarra contends that Delaware has a strong interest in preventing its corporations from being used for abusive purposes, such as the Giant transaction. That argument, although correct in the abstract, overlooks the fact that that policy interest is already served by the General Assembly having conferred jurisdiction on Delaware's courts to police fiduciary breaches committed through a misuse of the Delaware corporate form. For Delaware courts to fulfill that role, however, their power to act must first be properly invoked. A Delaware court has no power to intervene unless and until the plaintiff's standing to invoke its jurisdiction is established.[25] The policy interest that Sagarra invokes does not, and cannot, operate as a protean ethic that trumps, on an *ad hoc* basis, settled choice of law rules that govern the right of a stockholder to enforce, derivatively, claims that belong to the corporation in which it owns shares.

When Sagarra took ownership of its Uniland shares, it did so with presumed knowledge that its ownership interest was subject to the legal rights conferred, and the restrictions imposed, by the Spanish legal regime.[26] Whatever legal rights Sagarra initially contracted for to challenge a transaction whose terms were determined and structured at the Uniland level would necessarily be defined by Spanish law. For this Court to disrupt the internal affairs of a Spanish corporation by displacing Spanish derivative standing rules with those of Delaware, would serve no legitimate Delaware interest and would violate the principle of comity. As the Vice Chancellor rightly noted in his Opinion, "[a]lthough a Delaware entity may be involved in the corporate structure, the Court is mindful of the important interest of affording comity to foreign business law governing the internal affairs of a foreign corporation." As we have recognized, "comity" is the "recognition [of] ... the legislative, executive, or judicial acts of another nation ... [in] due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."[27] If any principle of public policy should apply here, it is that of comity. That principle compels that we reaffirm the analysis and result reached by the Court of Chancery.

## CONCLUSION

For the above reasons, the judgment of the Court of Chancery is affirmed.

---

**25.** *Id.* at 1125 ("Delaware has more than an interest in providing a sure forum for shareholder derivative litigation involving the internal affairs of its domestic corporations. Delaware has an obligation to provide such a forum.").

**26.** *McDermott Inc. v. Lewis,* 531 A.2d 206, 217 (Del.1987) ("Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs.").

**27.** *Taylor v. LSI Logic Corp.,* 715 A.2d 837, 842 (Del.1998).