[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-15303
_____

Docket No: 9:17-cv-80940-RLR

ROBERT FREEDMAN, individually
and on behalf of all others similarly situated,

Plaintiff - Appellant,

versus

MAGICJACK VOCALTEC LTD.,
an Israeli corporation;
DON C. BELL III,
GERALD VENTO,
DONALD A. BURNS,
RICHARD HARRIS,
YUEN WAH SING,
ALAN HOWE,
IZHAK GROSS,
TALI YARON-ELDAR,

Defendants - Appellees.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 25, 2020)

Before NEWSOM, TJOFLAT, Circuit Judges, and PROCTOR[*], District Judge.

PROCTOR, District Judge:

Appellant Robert Freedman ("Freedman") is a shareholder of one of the Appellees, magicJack Vocaltec Ltd. ("magicJack").[1] Freedman filed a putative class action complaint against magicJack and eight individuals who were magicJack current or former directors. In his class allegations, Freedman claimed that magicJack issued two proxy statements that contained material misrepresentations. The district court gave Freedman multiple chances to amend his pleadings to state a claim. Ultimately, the court dismissed his lawsuit because his claims were derivative in nature and he failed to plead that he made a demand on magicJack or that doing so would have been futile.

In this appeal, Freedman argues that (1) the operative complaint, which here is his Second Amended Complaint, is direct in nature, and the district court erred in concluding otherwise, and (2) he properly pleaded violations of Section 14(a) of the Securities and Exchange Act of 1934 ("the Act") and Section 20(a) of the Act. After careful review, and with the benefit of oral argument, we agree with the well-reasoned analysis of the district court, which concluded the claim at issue was

---

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] Appellee magicJack is a publicly-traded company organized under the laws of Israel, with its principal place of business in Florida. The other Appellees are current or former directors of magicJack.

2

derivative rather than direct in nature.

## I.    FREEDMAN'S CLASS ALLEGATIONS

In the district court, Freedman filed a class action complaint alleging that magicJack made material misrepresentations and/or omissions in two proxy statements that were sent to its shareholders. The alleged misrepresentations relate to the valuation and financial prospects of Broadsmart, a company magicJack acquired in March 2016 for $40 million, and a compensation package for magicJack executives. See DE 59, ¶¶ 2, 23.

The first proxy statement that Freedman challenges was issued by magicJack on March 15, 2017 (the "March 15 Proxy"). DE 61-1. Freedman contends that the statement was sent in order to solicit votes for a director's election at the upcoming April 19, 2017 shareholder meeting. Id. In particular, in his complaint, Freedman challenged the following statement in the March 15 Proxy:

> Your Board and Management are excited about the possibilities for restoring growth at magicJack under Mr. Bell's leadership. The seeds of change that we planted to evolve the business have already taken root and magicJack is well-positioned to harvest the fruits of its labor. The opportunity for meaningful future value creation is reflected in our growing Broadsmart pipeline, which currently includes large enterprise opportunities. This includes active pilots with two large North American businesses with thousands of locations, both of which would contribute significant monthly recurring revenues.

DE 61-4 at 4.[2] Freedman claims that this statement was misleading because of

---

[2] While not material to the analysis here, as the district court pointed out, this language

3

Broadsmart's diminished value. He further contends that the statements in the March 15 Proxy were designed to "entrench" the magicJack directors in office, seeing as though, due to the deception, "[o]n April 19, 2017, [t]he Individual Defendants were elected to the magicJack board." DE 59, ¶ 36.

The second challenged proxy statement was issued on June 23, 2017 (the "June 23 Proxy"). The June 23 Proxy was sent in advance of a July 31, 2017 shareholder meeting. DE 61-7. The July 31 meeting was a special meeting to allow shareholders to vote on an employment agreement for the company's new CEO, Don C. Bell, III ("Bell"), and to approve changes to magicJack's stock incentive plans, compensation policy, and the compensation to be paid to its outside directors. DE 59, ¶¶ 48, 51; DE 61-7; DE 61-8. The agreement included financial incentives and severance pay provisions tied to the completion of a change-in-control transaction (i.e., a sale of magicJack). DE 59, ¶ 51.

On November 9, 2017, after these proxy statements were sent, magicJack entered into a sale agreement (the "B. Riley Transaction"), which provided that the Company would be sold to B. Riley & Co. ("B. Riley") for a price of $8.71 per share. DE 61-11 at 2-3. On February 8, 2018, magicJack issued a proxy statement

does not appear in the March 15 Proxy itself, but rather in magicJack's Additional Proxy Materials, also issued on March 2017. DE 61-4. This supplement is not cited in the operative complaint. See id.

4

in connection with a shareholder meeting to be held on March 19, 2018 for the purpose of voting on whether to approve the B. Riley Transaction. Id. The transaction was eventually approved by shareholders. DE 61-12 at 2.

In his operative class action complaint (the Second Amended Complaint), Freedman claimed on behalf of himself and the putative class to have suffered injuries based upon the misleading information contained in the March 15 and June 23 Proxies (i.e., they were denied the ability to exercise an informed vote). DE 59, 29. He also claimed that he and the other shareholders were injured due to the $8.71 per share price, which he contends was less than an earlier non-binding, pre-due diligence offer of $9.50 per share.[3] DE 59, 29; DE 61-11 at 22-24.

II.    PROCEDURAL HISTORY

On August 11, 2017, Freedman filed his initial class action complaint against two entities, magicJack Vocaltec Ltd. and YMax Corporation ("YMax"), and nine of magicJack's current or former directors—Bell, Gerald Vento, Donald A. Burns, Richard Harris, Yuen Wah Sing, Alan Howe, Izhak Gross, Tali Yaron-Eldar, and Yoseph Dauber. DE 1. This action was brought on behalf of Freedman and a putative class of "all holders of magicJack Vocaltec Ltd. common stock who were or will be harmed by Defendants' actions as described" in the complaint. DE

---

[3] Freedman does not allege that the proxy statement regarding the B. Riley Transaction contained any misleading statements or omissions, and he does not challenge that proxy statement in the operative complaint in any fashion.

5

59, ¶ 56. In other words, the suit was brought on behalf of a class of shareholders who received the proxy statements at issue in this case. Id. Freedman defined the putative class as "all purchasers of the common stock of magicJack during the Class Period." DE 59, ¶ 67.

On January 2, 2018, Freedman voluntarily dismissed all claims against Yoseph Dauber ("Dauber") and filed an amended complaint. DE 36, 37. The amended complaint continued to assert claims on behalf of a class of shareholders. DE 37.

After Freedman amended his class complaint, the remaining defendants moved to dismiss. DE 38. The district court found that the amended complaint was derivative in nature and dismissed it without prejudice. DE 57 at 3. The court permitted Freedman "one more opportunity to amend." Id. Although it was willing to extend that grace, the district court warned that if "[Freedman] contends that he is bringing an individual claim," he would be required to amend his pleadings. Id. at 2. The district court made this point crystal clear: "If it is [Freedman's] intent to pursue an individual claim, [his] Complaint should make it clear that the alleged injuries in this case flowed to [him] and not to the . . . corporation." Id. Freedman subsequently filed his Second Amended Complaint against all of the then-remaining defendants, with the exception of YMax. DE 59.

The Second Amended Complaint contains two counts. The first count

purports to state a claim against all Defendants for violations of Section 14(a) of the Act and SEC Rule 14a–9. The second count asserts a claim against the individual Defendants for control-person liability under Section 20(a) of the Act. DE 59.

magicJack moved to dismiss the Second Amended Complaint, arguing that the claims were derivative in nature and Freedman had not made a demand on the corporation prior to asserting the derivative claim. DE 60. Without addressing the merits of the Second Amended Complaint, the district court granted magicJack's motion. The court applied Israeli law because it determined that nation's law controlled, and, in any event, that Israeli law closely parallels Florida law—the law of the forum state. See DE 64 at 6. The district court concluded that Freedman's claims were derivative in nature, and that Freedman failed to make a demand on magicJack (or, alternatively, allege that such a demand would have been futile). Therefore, the district court ruled that the Section 14(a) claim was due to be dismissed under Federal Rule of Civil Procedure 23.1. DE 64. And, because the Section 14(a) claim was due to be dismissed, the district court also dismissed the Section 20(a) control-person liability claim because Freedman had not adequately pled the underlying violation (i.e., the Section 14(a) claim). DE 64 at 11.

The primary issue in this appeal is whether Freedman's Section 14(a) claim is derivative in nature. For the reasons explained below, we agree with the district

7

court that Freedman's claim is clearly a derivative one.

## III.    STANDARD OF REVIEW

We review a district court's dismissal under Federal Rule of Civil Procedure 23.1 for abuse of discretion.[4] Stepak v. Addison, 20 F.3d 398, 402 (11th Cir. 1994) (citing Rothenberg v. Sec. Mgmt. Co., 667 F.2d 958, 960 (11th Cir. 1982)); see Peller v. Southern Co., 911 F.2d 1532, 1536 (11th Cir. 1990) (reviewing the denial of a Rule 23.1 motion to dismiss for abuse of discretion).

## IV.    DISCUSSION

We begin our analysis by discussing which body of law supplies the rule used in determining if a claim such as this one is derivative (as opposed to direct). We conclude that the law of the state (or place) of incorporation of the entity sued supplies that rule of decision, and we explain why that is so. Next, we apply the appropriate rule and conclude that, under the circumstances of this case, Freedman's claim is derivative in nature.

### A.    What Law Supplies the Rule of Decision?

Although courts have weighed in on the issue, our Circuit has not had the occasion to directly address the following question in a published decision: Which

---

[4] The court acknowledges that magicJack moved to dismiss Freedman's Second Amended Complaint under Federal Rules of Civil Procedure 9(b), 12(b)(6), and 23.1, 15 U.S.C. § 78u-4(b)(3)(A), and Local Rule 7.1. DE 60 at 1. However, the district court did not reach the merits of Freedman's pleading and focused solely on the issue of whether the allegations were direct or derivative. DE 64. This indicates that dismissal was rendered under Rule 23.1.

body of law must a court look to in determining whether a lawsuit is direct or derivative. The Supreme Court has noted that "[u]nder state law, the determination whether a derivative representative can initiate a suit without making demand typically is made at the outset of the litigation and is based on the application of the [s]tate's futility doctrine to circumstances as they then exist." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98, 104 (1991) (citation omitted); see Burks v. Lasker, 441 U.S. 471, 478 (1979) ("[T]he first place one must look to determine the powers of corporate directors is in the relevant [s]tate's corporation law.") (citations omitted).

Other circuits have recognized that courts must look to the law of the state of incorporation to determine whether an action is direct or derivative. E.g., Kokocinski ex rel. Medtronic, Inc. v. Collins, 850 F.3d 354, 368 n.4 (8th Cir. 2017) ("When a derivative suit raises a federal question, the law of the state of incorporation "govern[s] the authority of independent directors to discontinue derivative suits . . . ."); AHW Inv. P'ship v. Citigroup, Inc., 806 F.3d 695, 699 (2d Cir. 2015) ("In diversity cases . . . federal courts look to the laws of the forum state in deciding issues regarding conflicts of law. . . . Under New York law, we look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative.") (quotation omitted) (internal quotation marks omitted); Casden v. Burns, 306 F. App'x 966, 974 (6th Cir. 2009) ("Whether [the plaintiff's] claim is

9

direct or derivative is governed by the law of Virginia, [the company's] state of incorporation.") (citations omitted); In re Abbott Labs. Derivative Shareholders Litig., 325 F.3d 795, 803 (7th Cir. 2003) ("Because [the defendant] was incorporated under the laws of Illinois, Illinois law applies in determining whether a demand may be excused when shareholders file a derivative complaint on behalf of the company.") (citation omitted); Lapidus v. Hecht, 232 F.3d 679, 682 (9th Cir. 2000) ("[W]e rely upon state law to determine whether the plaintiffs' claims are direct or derivative."); Boland v. Engle, 113 F.3d 706, 715 (7th Cir. 1997) (instructing "federal courts [to] look to the law of the state where the . . . company is incorporated" to determine whether an action is direct or derivative).

It is time for our Court to answer this question and to definitively explain our reasoning. We begin with the proposition that although federal law provides the rule of decision, federal courts should look to state law in deciding the issue of whether a particular suit is direct or derivative. See, e.g., Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1821 (3d ed. 2020) ("The question whether a particular suit is derivative or direct is not always capable of easy resolution. In a diversity action, the determination will be made under state law; in suits in which the rights being sued upon stem from federal law, federal law will control the issue whether the action is derivative."). In Kamen v. Kemper Financial Services, the Supreme Court observed that when a federal court fills gaps in a

10

federal statute with state law, the "state law [is] . . . incorporated into federal common law." 500 U.S. at 98. So, we look to the law of the state (or place) of incorporation to determine whether an action is direct or derivative. There are at least two reasons why that is so.

First, "corporate law is overwhelmingly the province of the states."[5] Marsh v. Rosenbloom, 499 F.3d 165, 176 (2d Cir. 2007) (citing Kemper, 500 U.S. at 98-99). One reason for this is that "[a]pplication of [the law of the state of incorporation] achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation." First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983), superseded by statute on other grounds, Foreign Sovereign Immunities Act, Pub. L. No. 114-222, 130 Stat. 853 (2016) (codified as amended in 28 U.S.C. §§ 1602-1611), as recognized in Rubin v. Islamic Republic of Iran, 138 S. Ct. 816 (2018) (citing Restatement (Second) of Conflict of Laws § 302, Comments a & e (1971)). Further, as the Second Circuit has correctly observed:

> The Federal Rules of Civil Procedure provide that state law governs a
> corporation's capacity to be sued, [see Federal Rule of Civil

---

[5] The court acknowledges that not every aspect of corporation law rests on state law. For example, if a state law conflicts with the federal corporate scheme, that law would likely be preempted. But, "[f]or preemption to occur in this instance, then, the conflict between state law and federal policy must be a 'sharp' one." Marsh, 499 F.3d at 178 (citing Boyle v. United Tech. Corp., 487 U.S. 500, 507 (1988)).

11

Procedure] 17(b), and the Supreme Court has held that "[h]ow long and upon what terms a state-created corporation may continue to exist is a matter exclusively of state power," with the federal government "powerless to resurrect a corporation which the state has put out of existence for all purposes."

Marsh, 499 F.3d at 176-77.

Second, as the Supreme Court has recognized, there is a "presumption that state law should be incorporated into federal common law . . . in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards." Kamen, 500 U.S. at 98 (citations omitted). Importantly, "[c]orporation law is one such area." Id.; see Strougo v. Bassini, 282 F.3d 162, 168 (2d Cir. 2002). As such a presumption suggests, these "state-law standards" create the boundaries within which a corporation must operate both internally and externally—including the structure of corporate governance employed by the corporation. Indeed, it is widely accepted that "[c]orporations . . . are creatures of state law, . . . and it is state law which is the font of corporate directors' powers." Kamen, 500 U.S. at 98-99 (citations omitted) (internal quotation marks omitted); see In re Delmarva Sec. Litig., 794 F. Supp. 1293, 1301-02 (Del. 1992) ("[C]orporations are creatures of state law, and . . . except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law governs the internal affairs of the corporation . . . .").

12

It follows, therefore, that the rule directing a court to look to the law of the state or place of incorporation to answer the "direct vs. derivative" question is a logical one. After all, the law of the state or place where a company is incorporated establishes the requirements that a shareholder must meet before bringing either a direct or derivative claim against a corporation. For instance, if a shareholder wishes to bring a derivative claim, he must first make a demand on the corporation. See e.g., Instituto de Prevision Militar v. Lehman Bros., Inc., 485 F. Supp. 2d 1340, 1346 (S.D. Fla. 2007) (citing Fed. R. Civ. P. 23.1) ("[A] shareholder derivative suit is a special type of lawsuit with special requirements, including the demand requirement."). This is a prime example of why a court should look to the state or place of incorporation to fill in the gaps of federal law in assessing the parties' rights in corporate litigation.

Under Florida's choice-of-law rules – the relevant state's laws for choice-of-law purposes here – a court is to adhere to the "internal affairs" doctrine when faced with a question concerning corporate powers, as codified in the Florida Business Corporation Act.[6] See Fla. Stat. § 607.1505; Restatement (Second) of Conflict of Laws §§ 302-9 (1971); see also In re Friedlander Capital Mgmt. Corp.,

---

[6] Our Circuit has also analyzed choice-of-law questions by looking to the Restatement (Second) of Conflicts of Laws. See Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) (noting that we are comfortable "in applying the Restatement (Second) of Conflicts of Laws § 309" in circumstances concerning corporate law).

13

411 B.R. 434, 442 (Bankr. S.D. Fla. 2009) ("As to Florida's choice of law rules, [c]laims involving internal affairs of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation.") (quoting Chatlos Found., Inc. v. D'Arata, 882 So. 2d 1021, 1023 (Fla. App. 5th Dist. 2004)) (internal quotation marks omitted). The internal affairs doctrine instructs that "the extent and nature of [the] relationship between corporation and stockholder, corporate officer or director and stockholder[,] and . . . stockholders inter sese" should be governed by the laws of the state of incorporation. Mansfield Hardwood Lumber Co. v. Johnson, 268 F.2d 317, 321 (5th Cir. 1959);[7] see Edgar v. MITE Corp., 457 U.S. 624, 645 (1982) (holding that "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" are a corporation's internal affairs). Thus, under Florida law, the place of incorporation (here, Israel) would provide the pertinent rule of law in deciding this issue. Other courts in our Circuit have reached this same conclusion. For example, in Gadd v. Pearson, 351 F. Supp. 895 (M.D. Fla. 1972), the defendants were former directors of British-American Bank, Ltd., which was incorporated under the laws of the Bahamas. Id. at 898. Faced with the question of what law determines whether a claim is direct or derivative, the district court

---

[7] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

14

concluded that "Bahamian law [the law of the state of incorporation] will apply in determining the status of plaintiff and the nature of the action as derivative or direct."[8] Id. at 902.

Requiring a shareholder to make a demand on the corporation before filing suit on its behalf (i.e., a derivative suit) allows the corporation to exercise its business judgment and decide whether to accept the demand. When such a demand occurs, it allows a company's board to exercise a duty of care in deciding how to respond to it. Of course, that duty of care is unquestionably guided by state law, because state law provides the basis for corporate directors' powers. Kamen, 500 U.S. at 98-99 (citations omitted) (internal quotation marks omitted); see also Brody v. Chem. Bank, 517 F.2d 932, 934 (2d Cir. 1975) (citing In re Kauffman Mut. Funds Actions, 479 F.2d 257, 263 (1st Cir. 1973), cert. denied, 414 U.S. 857 (1973)) ("[T]he very purpose of the 'demand' rule is to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs."). A panel of this Court has reached the same result, albeit in an unpublished decision. See Conroy on

---

[8] This same analysis has been utilized by various state supreme courts. For example, in Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A., 34 A.3d 1074 (Del. 2011), the Supreme Court of Delaware held that the law of Spain governed the presuit demand requirements that the plaintiff must satisfy in order to sue derivatively because Spain is "the jurisdiction of incorporation of the entity in which the plaintiff owns shares." Id. at 1081.

behalf of Aflac, Inc. v. Amos, 785 F. App'x 751, 757 (11th Cir. 2019) ("The law of the state of incorporation controls the contours of a demand against a corporation.").

For these reasons, we hold – as a federal rule of decision – that federal courts should look to state law to decide the issue of whether a claim brought under a federal statute is direct or derivative. See Kamen, 500 U.S. at 98 (noting that when a federal court fills gaps in a federal statute with state law, the "state law [is] . . . incorporated into federal common law").

### B.    The District Court's Application of Israeli Law

As we have explained, the question of whether an action is derivative (rather than direct) is a question of state law. But, the Second Amended Complaint alleges that magicJack is an Israeli corporation and was incorporated under Israeli law. DE 59, ¶¶ 9-10. The district court, therefore, "look[ed] to Israeli law to determine whether this action is a [direct or derivative] action, because magicJack is incorporated in Israel." DE 64 at 6. In particular, the district court examined English translations of two decisions rendered by the courts of Israel that were submitted by magicJack and the individual defendants.[9] Therefore, it is necessary for us to address the district court's reliance on those Israeli court decisions below.

---

[9] Freedman has not disputed the authenticity or accuracy of the translations, either in our Court or the district court.

16

The district court found the District Court of Israel's decision in Delek Real Estate Ltd. v. Yitzha (Sharon) Tshuva to be instructive. In Delek Real Estate, the Israeli court observed, in relevant part:

> The damage caused in the present case, according to the statements in the motion, stems from misrepresentations and misleading statements that were made mainly by Respondent 3, as CEO of the Company.
>
> The Applicant claimed, as mentioned, that the investigation of the Securities Authority and the publication of its findings led to the collapse of the Company's value, to the drop in the value of the Company's shares and to the cumulative damage to the group of shareholders.
>
> This damage is common to all the Company's shareholders. There is no basis for the claim that there is a difference between the damage caused to some of the shareholders and damage caused to others. . . .
>
> In the end, any misrepresentation and false statements that led, after the situation became clear, to the decline in the value of the Company as described by the Applicant in the motion – constitutes damage caused to the Company and as a result of this, to all shareholders equally.

CA (TA) 52310-11-11 Delek Real Estate Ltd. v. Yitzhak (Sharon) Tshuva (2012) (Isr.);[10] DE 61-13 at 51. In Delek Real Estate, the "[a]pplicant filed a class action in the amount of NIS 720 million and a motion to certify the claim as a class action under section 8 (a) or 8 (c) of the Class Actions Law." DE 61-13 at 32. The applicant in that case alleged that:

> [D]amage was incurred by the shareholders of the Company as a

---

[10] We acknowledge that the submitted translation of the Delek Real Estate decision does not contain page numbers, while the submitted translation of the Magen & Keshet Ltd. decision does.

17

result of serious acts and omissions performed by the controlling shareholder and by the members of the Board of Directors, including a series of false and misleading statements that were made in the Company's financial statements and reports, some of which were inflated and false valuations and misrepresentations.

Id. at 33. The court denied the applicant's motion, ruling that any "[m]isleading statements and misrepresentations," which were made to the Company's accountants and "that led . . . to the decline in the value of the Company . . . constitutes damage caused to the Company and as a result, to all the shareholders equally." Id. at 34.

Additionally, the district court examined the decision of the Israeli High Court (presiding as the Civil Appellate Court) in Magen & Keshet Ltd. v. Tempo Beer Indus. Ltd. There, the Israeli appellate court noted that as a "general rule of thumb":

> [W]hen a shareholder sustains damage independent of the damage the company sustains, he has a personal claim independent of the damage the company sustained. However if the damage the shareholder sustained was due to the depreciation in value of the company and the value of its shares, and all the shareholders were damaged to the same degree, usually - the shareholder does not have grounds to a personal claim. This is secondary damage reflecting the company's damages.

CA 2967/9595 Magen & Keshet Ltd. v. Tempo Beer Indus. Ltd. 51(2) L.R. 312, 330 (1997) (Isr.); DE 61-13 at 19.

In Magen & Keshet Ltd., the appellants were publicly-held shareholders of appellee, Tempo Beer Industries. ("Tempo"). DE 61-13 at 9. Appellants filed a

18

class action against Tempo, challenging its merger with Tempo Plastic. Id. They claimed that Tempo "deliberately procrastinated" with respect to the merger to allow the controlling shareholders to "reap the profits of Tempo Plastic into the majority shareholders in Tempo's pockets instead of ensuring, by the merger, that the profits would be transferred to Tempo within a reasonable period of time." Id. at 10. The district court had ruled that "the [a]ppellants did not overcome the first hurdle to file a class action, i.e., the existence of a personal claim, a condition required under Section 54A(a) to the [Securities Law, 5278 – 1968]." Id. On appeal, the Israeli Civil Appellate Court held that the appellants had not established a "personal claim," which would have allowed them to bring the lawsuit directly, because the injury they suffered was also suffered by the corporation. Id. at 18, 26.

To be clear, the result reached by the district court, and the result we reach here, is not an anomaly driven by the application of Israeli law, which is wholly consistent with Florida law on the key issue in this case. That is, Florida law similarly limits when a shareholder action may be brought directly, as opposed to derivatively, against a corporation. A direct action may be maintained only where "(1) there is a direct harm to the shareholder or member such that the alleged injury does not flow subsequently from an initial harm to the company, and (2) there is a special injury to the shareholder or member that is separate and distinct from those

19

sustained by the other shareholders or members."[11] Dinuro Invs., LLC v. Camacho, 141 So. 3d 731, 739-40 (Fla. 3d DCA 2014). See also Strazzulla v. Riverside Banking Co., 175 So. 3d 879, 884-85 (Fla. 4th DCA 2015) ("After reviewing prior cases in our district, we agree with the Third District and adopt a two-prong test as follows: In order for shareholders to bring a direct action in their individual capacity, the shareholders must allege both a direct harm and special injury.").

Furthermore, under Florida law, "[a]bsent proof that foreign law differs from that of [the forum state], the [c]ourt is entitled to presume it is the same." Pycsa Panama, S.A. v. Tensar Earth Techs., Inc., 625 F. Supp. 2d 1198, 1252 (S.D. Fla. 2008) (citing Nicole v. Nicole–Sauri (In re Estate of Santos), 648 So. 2d 277, 284 (Fla. 4th DCA 1995) ("[U]nder a principle of choice-of-laws doctrine, absent proof that foreign law is different from the law of Florida, the court is entitled to presume it is the same.").

For all of these reasons, we conclude that because magicJack is incorporated under the laws of Israel, see DE 61-12, Israeli law controls our analysis here. But,

---

[11] We do note that Israeli law appears unsettled as to a "special injury" requirement. However, as the district court correctly noted, where a foreign law applies, but is not fully settled or addressed, courts generally apply the law of the forum state. See DE 64 at 7 n.2 (citing Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1321 (11th Cir. 2004) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice.") (quoting Restatement (Second) of Conflicts of Laws § 136, cmt. h (1971)). Thus, we apply Florida law on this issue. Florida law requires a special injury. See Strazzulla, 175 So. 3d at 884-85.

even if we applied Florida law, the result would be the same because the two bodies of law are consistent.

### C.    Application of the Appropriate Rule

Determining whether a claim is direct or derivative does not depend on the label given by the plaintiff; instead, such a determination depends on the nature of the claims raised in the complaint. We conclude that Freedman's claims are derivate in nature.

Under Israeli law, in order to bring a direct claim, a shareholder must "sustain damage independent of the damage the company sustains." CA 2967/9595 Magen & Keshet Ltd. v. Tempo Beer Indus. Ltd. 51(2) L.R. 312, 315 (1997) (Isr.); DE 61-13 at 4. With direct claims, the relief "flows *directly* to the stockholders, not to the corporation." Culverhouse v. Paulson & Co. Inc., 791 F.3d 1278, 1280 (11th Cir. 2015) (emphasis added) (quotation omitted).

In contrast, a claim is derivative where "all the shareholders [are generally] damaged to the same degree," CA 2967/9595 Magen & Keshet Ltd. v. Tempo Beer Indus. Ltd. 51(2) L.R. 312, 315 (1997) (Isr.); DE 61-13 at 4, and "any recovery obtained . . . 'must go to the corporation.'" Culverhouse, 791 F.3d at 1280 (quoting Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1036 (Del. 2004)).

In his Second Amended Complaint, Freedman utterly failed to allege that he suffered damages independent of the damages that magicJack (and all of its

21

shareholders) suffered. As the United States Supreme Court has held, "[t]he injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done to the corporation, rather than from the damage inflicted directly upon the stockholder." J.I. Case Co. v. Borak, 377 U.S. 426, 432 (1964), abrogated on other grounds by Ziglar v. Abbasi, 137 S. Ct. 1843 (2017).

The conclusion that Freedman's claim is derivative is reinforced by his failure to plead that he personally suffered a special injury, distinct from that experienced by magicJack or its other shareholders. The District Court of Israel has held that a decline in the value of a company caused by misrepresentations and false statements made by officers of a company "constitutes damage caused to the [c]ompany and as a result [], to all shareholders equally." CA 523-11-11 Gersht v. Tshuva 51(2) L.R. 315 (2012) (Isr.). Florida law is wholly consistent (again, with the possible exception of the question of "special injury"). See Strazzulla, 175 So. at 883 ("[T]he examining court must 'compare the individual plaintiff's alleged injury to those injuries suffered by the other members or shareholders of the company and then determine whether the plaintiff's injury is separate and distinct from other members or shareholders.'") (citation omitted).

It is also significant that Freedman filed this case as a class action. Although not dispositive of the direct vs. derivative issue, even a cursory review

22

of the allegations in his Second Amended Complaint indicates that he alleges he

suffered the same injuries as other shareholders.[12] Moreover, Federal Rule of

Civil Procedure 23.1 parallels Florida law and Israeli law:

> [I]n order to bring a derivative suit against a corporation, the
> complaint must . . . state with particularity: (A) any effort by the
> plaintiff to obtain the desired action from the directors or comparable
> authority and, if necessary, from the shareholders or members; and
> (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1; see Staehr v. Alm, 269 F. App'x 888, 891 (11th Cir. 2008).

Here, Freedman's Second Amended Complaint is devoid of any allegation that he

made a demand on magicJack or, alternatively, that doing so would have been

futile.

Finally, any recovery sought in the Second Amended Complaint would

necessarily be for the benefit of magicJack and its shareholders. Freedman alleges

that magicJack's officers issued the allegedly misleading proxy statements, at

least in large part, to obtain personal compensation. DE 59, ¶¶ 48, 52. Freedman

asked the district court to enjoin any payments "caused by or related to the two

defective proxy statements" and to rescind such payments in the event that

magicJack was sold.[13] DE 59 at 29. Freedman also sought damages in the form of

---

[12] We, of course, recognize that in certain cases there may be class actions pursued by a shareholder on behalf of other shareholders that actually present direct (not derivative) claims. This is not one of them.

[13] Freedman's claim related to excessive compensation would necessarily "flow . . . from

the difference between the $8.71 per share buyout offer magicJack accepted and the $9.50 per share buyout offer magicJack rejected. DE 59 at 29.[14] Indubitably, each form of requested relief sought by Freedman is derivative in nature, and Freedman's claim is a derivative claim—whether we apply Israeli law or Florida law. Freedman was therefore required to make a demand on magicJack or show why such a demand would have been futile. This he did not do.

## V.    CONCLUSION

For all of these reasons, we conclude that the district court did not err in granting magicJack's Motion to Dismiss. Because the district court correctly concluded that Freedman's claim was derivative, and thus due to be dismissed, it was unnecessary for it to reach the merits of the claims in Freedman's Second Amended Complaint.[15]

---

an initial harm to [magicJack, the payor of the compensation]." Dinuro Invs., LLC, 141 So. 3d at 739.

[14] We note that the claimed damages to the share value are non-recoupable in this action because Freedman did not challenge the proxy statement related to the B. Riley Transaction. But even if he had, the relief requested (i.e., the buyout share price) concerns a business decision made by magicJack's Board of Directors, and challenging such decision clearly falls within the ambit of a derivative lawsuit. See CA 2967/9595 Magen & Keshet Ltd. v. Tempo Beer Indus. Ltd. 51(2) L.R. 312, 330 (1997) (Isr.) ("[A] wrong to the incorporated group as a whole that depletes or destroys corporate assets and reduces the value of the corporation's stock gives rise to a derivative action."). DE 61-13 at 19.

[15] In Count II of the Second Amended Complaint, Plaintiff purports to state a claim under Section 20(a) of the Exchange Act for control-person liability against each Individual Appellee. However, "[b]ecause a primary violation of the securities laws [such as a violation of § 14(a)] is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded." Mizzaro v. Home Depot,

The decision of the district court is AFFIRMED.

---

Inc., 544 F.3d 1230, 1237 (11th Cir. 2008) (citations omitted). Here, because Freedman has failed to adequately plead a violation of Section 14(a), the district court also did not err in dismissing his Section 20(a) claim.